**TAB 2**

LEXSEE 2007 US DIST LEXIS 21928

**CITY OF ANN ARBOR EMPLOYEES' RETIREMENT SYSTEM, et al., Plaintiffs, v. GUY GECHT, et al., Defendants. and ELECTRONICS FOR IMAGING, INC., a Delaware Corporation, Nominal Defendant.**

**No. C-06-7453 EMC**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 21928**

**March 9, 2007, Decided
March 9, 2007, Filed**

**SUBSEQUENT HISTORY:** Motion granted by Ind. State Dist. Council of Laborers & Hod Carriers Pension Fund v. Gecht, 2007 U.S. Dist. LEXIS 26529 (N.D. Cal., Mar. 22, 2007)

**COUNSEL:** [*1] For City of Ann Arbor Employees' Retirement System, on Behalf of Itself and All Others Similarly Situated, and Derivatively on Behalf of Nominal Defendant Electronics For Imaging, Inc., Plaintiff: Merrill G. Emerick, LEAD ATTORNEY, Anderlini, Finkelstein & Emerick, San Mateo, CA; Cynthia A. Calder, Grant & Eisenhofer P.A., Wilmington, DE US; Mary Sikra Thomas, Michael J. Barry, Stuart M. Grant, Grant & Eisenhofer, P.A., Wilmington, DE.

For Kevin Fennimore, Trueman Parish, Plaintiffs: Alan R. Plutzik, Schiffrin Barroway Topaz & Kessler LLP, Walnut Creek, CA.

For Thomas I. Unterberg, Defendant: Ignacio E. Salceda, David L. Lansky, John Douglas Cooke, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA; Douglas John Clark, Wilson Sonsini Goodrich & Rosati, Professional Corporation, Palo Alto, CA.

**JUDGES:** EDWARD M. CHEN, United States Magistrate Judge.

**OPINION BY:** EDWARD M. CHEN

**OPINION**

**ORDER DENYING PLAINTIFF'S MOTION TO REMAND**

    **(Docket No. 7)**

Having considered the parties' briefing and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** Plaintiff City of Ann Arbor Employees' Retirement System's motion to remand. The Court also **DENIES** [*2] Plaintiff's request for attorney's fees pursuant to 28 U.S.C. § 1447(c).

**I. FACTUAL & PROCEDURAL BACKGROUND**

Plaintiff, a retirement system for employees of the City of Ann Arbor, is a shareholder of a company by the name of Electronics for Imaging, Inc. ("EFI"). Plaintiff filed a derivative suit and class action against various officers and directors of EFI, alleging, *inter alia,* that Defendants breached their fiduciary duty by failing to disclose in EFI's 2006 proxy statement their practice of backdating stock options to their benefit and to shareholders' detriment. EFI's 2006 proxy statement sought shareholder approval for (a) amendments to the 2004 Equity Incentive Plan and (b) an amendment to the 2000 Employee Stock Purchase Plan. *See* Compl. P 43; *see also* Ignacio Decl. ISO Mot. to Dismiss, Ex. A (2006 proxy statement). One of the amendments to the 2004 Equity Incentive Plan was to increase the number of shares of common stock authorized for issuance thereunder by an aggregate 4.5 million shares. The amendment to the 2000 Employee Stock Purchase Plan was to extend and increase a provision providing an automatic share increase in the [*3] number of shares authorized for issuance from 2006 through 2012. *See* Compl. P 1. The complaint alleges that the proxy solicitations were misleading because they did not disclose that, from at least 1996 through 2003, the Board improperly backdated options to certain current or former directors, senior officers, and other employees in violation of previously shareholder approved stock option plans. *See id.* P

2. The thrust of Plaintiff's complaint is that "[a] share-holder who knew that Company executives backdated options granted under prior plans (thereby providing not only improper compensation to EFI directors and employees but also artificially inflating net income and rendering certain tax deductions unavailable) would not have voted in favor of expanding the Compensation Committee's ability to issue stock options under the 2004 Plan or other forms of compensation under the 2000 Employee Stock Purchase Plan." Compl. P 56.

Plaintiff initially filed suit in state court on November 22, 2006. Before Plaintiff could serve the summons and complaint on any of the Defendants in the case, one of the Defendants -- namely, Thomas Unterberg -- made a general appearance in state [*4] court on December 5, 2006, and promptly removed to federal court on the same day. *See* Barry Decl., Exs. C-D. Plaintiff has moved to remand the case back to state court.

## II. DISCUSSION

Mr. Unterberg argues that removal is appropriate in the instant case pursuant to the removal provision of the Securities Litigation Uniform Standards Act ("SLUSA"), as well as the general removal statute. *See* 28 U.S.C. § 1441(b). There is a strong presumption against removal jurisdiction. Mr. Unterberg has the burden of establishing that removal is proper. *See Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir. 1992).

### A. SLUSA

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA") to curtail perceived abuses of the class-action vehicle in litigation involving nationally traded securities. *See Merrill Lynch, Pierce, Fenner & Smith v. Dabit,* 547 U.S. 71, 126 S.Ct. 1503, 1510, 164 L. Ed. 2d 179 (2006). Among other things, the PSLRA imposed heightened pleading requirements in actions brought pursuant to § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. *See id.* at 1511. However, the PSLRA

had [*5] an unintended consequence. It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether. Rather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class actions under state law, often in state court. The evidence presented to Congress during a 1997 hearing to evaluate the effects of the Reform Act suggested that this phenomenon was a novel one; state-court litigation of class actions involving nationally traded securities had

previously been rare. To stem this "shif[t] from Federal to State courts" and "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of" the Reform Act, Congress enacted SLUSA.

*Id.*

The core provision of SLUSA is as follows:

(1) Class action limitations. No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant [*6] used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

(2) Removal of covered class actions. Any covered class action in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).

15 U.S.C. § 78bb(f)(2). In short, SLUSA provides for the removal and preemption of certain securities class actions filed in state court. However, certain types of class actions are exempted under SLUSA if based on the statutory or common law of the issuer's state of incorporation. *See* 15 U.S.C. § 78bb(f)(3). The exemptions are known as the Delaware carve-outs.

In its motion to remand, Plaintiff does not dispute that its class action -- the first cause of action in its complaint -- falls within the scope of SLUSA. Plaintiff's only contention is that its class action cannot be removed or preempted pursuant to SLUSA because the class action

is covered by one of the Delaware carve-outs, namely, the second carve-out. [*7] [1] *See also Greaves v. McAuley*, 264 F. Supp. 2d 1078, 1085 (N.D. Ga. 2003) ("Once a 'covered class action' has been removed to a federal court, if the Delaware carve-out applies, the federal court is required to 'remand such action'. . . to state court.").

> 1  The Court acknowledges that, in opposition to Mr. Unterberg's motion to dismiss, Plaintiff claims that both Delaware carve-outs are applicable. However, because Plaintiff failed to raise the applicability of the first carve-out in its motion to remand, the Court addresses only the second carve-out.

Under the second Delaware carve-out, a class action is exempt from SLUSA's removal and preemption rules

> if it involves--
>
> > . . . .
> >
> > > (II) any recommendation, position, or other communication with respect to the sale of securities of an issuer that --
> > >
> > > (aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and
> > >
> > > (bb) concerns decisions of such equity holders [*8] with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

*Id.* § 78bb(f)(3)(A)(ii). According to Plaintiff, its class action "involve[s] 'recommendations' or 'communications with respect to the sale of securities of an issuer' because EFI was requesting shareholder approval to increase the amount of authorized EFI shares and transfer certain of these shares under certain stock option plans." Mot. at 9. Plaintiff continues that "the communications were made 'by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities' because EFI made the communications to EFI shareholders." *Id.* Finally, Plain-

tiffs asserts that "the communications involved 'decisions of such equity holders with respect to voting their securities' because EFI asked its shareholders to vote their securities to increase the authorized shares and increase the stock options." *Id.*

In opposition to the motion to remand, Mr. Unterberg argues that the above carve-out does not apply to Plaintiff's class action because the Supreme Court indicated in *Merrill Lynch* that SLUSA is intended to [*9] have a broad preemptive/removal effect. *See Merrill Lynch*, 126 S. Ct. at 1513 (stating that "Congress envisioned a broad construction [of SLUSA]" and that "[a] narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act"). However, *Merrill Lynch* is of limited support to Mr. Unterberg's position since, as Plaintiff points out, it does not directly address the scope of the Delaware carve-outs, and in particular, the second carve-out.

Mr. Unterberg further argues that the second Delaware carve-out is not applicable in the instant case because it "is limited to misrepresentations made in connection with proposed mergers or acquisitions." Opp'n at 11. But, as Plaintiff points out, the carve-out contains no such restriction. In fact, the carve-out expressly states that exempted class actions are those that involve communications with respect to the sale of securities that concern decisions of equity holders with respect to voting their securities *or* acting in response to a tender or exchange offer *or* exercising dissenters' or appraisal rights. *See* 15 U.S.C. § 78bb(f)(3). The statute's use of the disjunctive [*10] negates Mr. Unterberg's narrow interpretation of the carve-out. Furthermore, courts have applied the carve-out outside the context of a merger or acquisition. *See, e.g., In re Metlife Demutualization Litig.,* No. CV 00-2258 (TCP) (AKT), 2006 U.S. Dist. LEXIS 60104, at *21 (E.D.N.Y. Aug. 7, 2006) (finding that second Delaware carve-out applied in case involving reorganization).

Finally, Mr. Unterberg contends that the second Delaware carve-out is not applicable because Plaintiff has not alleged that the shareholder vote at issue was sufficiently related to the sale of securities. *See* Opp'n at 12. Mr. Unterberg does not dispute that the act of granting stock options constitutes the sale of securities. *See Falkowski v. Imation Corp.,* 309 F.3d 1123, 1129-30 (9th Cir. 2002) ("The grant of an employee stock option on a covered security is . . . a 'sale' of that covered security."). Rather, according to Mr. Unterberg, the problem for Plaintiff is that, in the 2006 proxy statement, Defendants did not seek shareholder approval for the actual granting of stock options. Instead, Defendants sought, *inter alia,* approval to increase the shares *authorized* [*11] for issuance under the 2004 Equity Incentive Plan. The question therefore, as posed by Mr. Unterberg, boils down to

2007 U.S. Dist. LEXIS 21928, *

whether a proxy statement seeking authorization for is-suance of more stock options, rather than authorization of actual grant of options, is related enough to constitute a communication "with respect to" the sale of securities of an issuer.

Resolution of this issue turns on the phrase "with re-spect to" as used in the second Delaware carve-out. There is no case law addressing the interpretation of "with respect to," but there are cases addressing the in-terpretation of the similar phrase "in connection with" (as used in SLUSA), and neither party has pointed to any provision in SLUSA, its legislative history, or case law suggesting that Congress's use of the two different phrases was intended to imply a difference in scope. Cer-tainly there is nothing obvious or inherent in the plain meaning of these phrases that would so suggest. Accord-ingly, the Court finds the construction of the phrase "in connection with" given by the Supreme Court and the Ninth Circuit persuasive in interpreting "with respect to." [2]

    2   While it may be argued that the policy of ap-plying SLUSA broadly could imply the threshold requisites for SLUSA should be more liberally construed than the carve-out, there is a counter-vailing concern, apparently reflected in the Dela-ware carve-out, that the legislation should not be construed so as to foster the federalization of cor-porate law. Cf. Ketchum v. Green, 557 F.2d 1022, 1029 (3d Cir. 1977). In any event, Mr. Unterberg has failed to cite any authority for imparting dif-ferent definitions here.

[*12]  In Merrill Lynch, the Supreme Court held that, in determining whether an alleged fraud is "in con-nection with" a purchase or sale of securities so as to trigger the application of SLUSA, "it is enough that the fraud alleged 'coincide' with a securities transaction." Merrill Lynch, 126 S.Ct. at 1513. The Ninth Circuit has similarly held that, pursuant to SLUSA, a fraud is "in connection with" a securities transaction if it "coincides" with the transaction or is "more than tangentially re-lated." Falkowski, 309 F.3d at 1130-1131.

In Falkowski, the Ninth Circuit held that state law fraud claims relating to employee stock options were preempted by SLUSA because the alleged fraud took place "in connection with the purchase or sale of a cov-ered security." See Falkowski, 309 F.3d at 1126. The court explained first that the granting of a stock option is a "purchase or sale" of a security for purposes of SLUSA: "The option is a contractual duty to sell security at a later date for a sum of money, should the employee choose to buy it out. Whether or not the employee ever exercises the option, it is a 'sale' under Congress's defini-tion. [*13]  " Id. at 1130. The court then concluded that

the alleged fraud was sufficiently related to the contract to sell stock to meet the "in connection with" require-ment.

    The claim that defendant concealed [an] impending accounting write-off suffi-ciently alleges fraud "in connection" with a contract to sell [company] shares be-cause it involves a misrepresentation about the value of the options. The claim that defendants concealed their plan to force early exercise of the options is also sufficient because it relates to the time pe-riod during which the Employees could exercise their rights to purchase. These al-legations both "coincide" with the securi-ties transaction and area easily character-ized as having "more than some tangential relation to" the securities themselves.

Id. at 1131.

While the Ninth Circuit has not further elaborated on what constitutes "more than tangentially related," it has held -- consistent with Merrill Lynch -- that the meaning of "in connection with" in the context of § 10(b) and Rule 10b-5 claims is instructive in construing SLUSA. See id. at 1129; see also Merrill Lynch, 126 S.Ct. at 1513 [*14]  (looking to how the Supreme Court has construed "in connection with" in the § 10(b) and 10b-5 context); Sofonia v. Principal Life Ins. Co., 465 F.3d 873, 877-78 (8th Cir. 2006) ("constru[ing] the phrase 'in connection with the purchase or sale of a covered security' as used in SLUSA by looking to interpretations of identical lan-guage used in § 10(b) of the Securities Exchange Act of 1934 and in Securities and Exchange Commission (SEC) Rule 10b-5"); Strigliabotti v. Franklin Res., Inc., 398 F. Supp. 2d 1094, 1100 (N.D. Cal. 2005) (taking note of the above standard in Falkowski and also noting that, in a case dealing with § 10(b) and 10b-5 claims, the Supreme Court concluded that there is a connection between an alleged fraud and a securities transaction where the fraudulent scheme and securities transaction "'coin-cide'"). Thus, cases which address the "in connection with" requirement of § 10(b) and Rule 10b-5 are illumi-nating to the issue at bar.

In In re Financial Corporation of America Share-holder Litigation, 796 F.2d 1126 (9th Cir. 1986), the Ninth Circuit held that, in the context of § 10(b),

    [o]ne factor [*15]  to be considered in determining whether the "in connection with" requirement has been met is whether a causal connection between the

fraud and the transaction has been shown. *Buffo v. Graddick,* 742 F.2d 592, 596 (11th Cir. 1984) (*citing Ketchum v. Green,* 557 F.2d 1022, 1025-30 (3d Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L. Ed. 2d 300 (1977). This "transactional nexus requirement is a species of causation [in fact]. Consistent with § 10(b)'s 'in connection with' limitation on liability, it prohibits claims based on the extremely attenuated links between plaintiff's injury and defendant's conduct [as alleged]." *Hudson v. Capital Management International, Inc.,* 565 F. Supp. 615, 622 (N.D. Cal 1983).

*Id.* at 1130.

In *Ketchum,* cited by the Ninth Circuit, the Third Circuit amplified the analysis of the nexus required to satisfy the "in connection with" requirement, holding that the "connection" element of § 10(b) concerns "the degree of proximity" between the securities transaction and the claimed fraud. *Ketchum,* 557 F.2d at 1028. The court gave as an example the "fairly [*16] tight linkage" in the Supreme Court's decision in *Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S. Ct. 165, 30 L. Ed. 2d 128 (1971), where the misrepresentation "was only one step removed" from the bond transaction and the transaction was "undertaken for the purpose of making possible the practices alleged to be deceptive." *Ketchum,* 557 F.2d at 1028.

Here, there is more than a "tangential" relationship between Defendants' allegedly fraudulent communications to shareholders and the prospective sale of securities at issue (*i.e.,* stock option grants). [3] *Falkowski,* 309 F.3d at 1130-31. The authorization sought by the allegedly misleading proxy statement has a "transactional nexus" with any further option grants. *In re Financial Corp. of Am. Shareholder Litig.,* 796 F.2d at 1130. The shareholder authorization was a necessary predicate to any further grants of backdated options, options contemplated by the complaint. [4] The complaint fairly implies the purpose of the misleading proxy solicitation was to facilitate further backdated options. There is thus clear causal connection between the proxy statement and the anticipated [*17] transaction.

> 3    Although not briefed by either party, the fact that the allegedly misleading communication concerned past sale of securities (backdated options granted in 1996-2003) makes this case somewhat unique. Plaintiff alleges that these misleading disclosures and omissions about these

grants were "essential links" in obtaining shareholder approval. It could therefore be argued that, at least *retrospectively,* the misleading proxy solicitation literally constituted a "communication with respect to the sale of securities" which was made by the issuer to shareholders and which concerned shareholder decisions with respect to voting their securities. However, in light of the Court's holding herein, this issue need not be resolved.

> 4    The complaint alleges that the Board is controlled by Defendants, *see* Compl. P 71, and that Defendants "improperly extracted from the public shareholders a portion of the economic value and voting power of the public shareholder's shares and redistributed the economic value and voting power to themselves and to the EFI employees under their control." *Id.* P 19. The complaint seeks a preliminary and permanent injunction barring issuance of any shares of common stock pursuant to the exercise of backdated options or the granting of any options under the 2004 Equity Incentive Plan. *See id.* P 113. The complaint thus fairly implies the proxy solicitation intended to facilitate further grants of improper stock options. *See Fed. Ins. Co. v. Tyco Int'l Ltd.,* 422 F. Supp. 2d 357, 391 (S.D.N.Y. 2006) ("When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff."); *Jamison v. Purdue Pharma Co.,* 251 F. Supp. 2d 1315, 1318 (S.D. Miss. 2003) ("When considering a motion to remand the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff."); *Clancy v. Bay Area Bank,* Nos. C97-0077 FMS, C96-4376 FMS, 1997 U.S. Dist. LEXIS 4914, at *9 (N.D. Cal. Apr. 7, 1997) ("Because a motion to remand is analogous to a motion to dismiss, the Court accepts the allegations of plaintiff's complaint as true.").

[*18]    Moreover, there is a high degree of proximity in the causal chain. Defendants would not need to make any further communications with shareholders before granting the options: no further shareholder approval is necessary once the authorization was obtained. The proxy statement was the last necessary "communication with respect to the sale of securities" which concerns "decision of such equity holders with respect to voting their securities." *Compare Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S. Ct. 165, 30 L. Ed. 2d 128 (1971) (case in which the misrepresentation in obtaining shareholder authorization was only

one step away from the granting of the options), *with Ketchum,* 557 F.2d at 1028 (noting that "there are a substantial number of intermediate steps between the fraud and the accomplishment of the forced sale of plaintiffs' shares: the shareholders' vote subsequent to the misrepresentation; the ensuing meeting of the company directorate during which the plaintiffs were removed as officers; and the adoption of the resolution terminating the plaintiffs' status as company employees."). *See also Brown v. Ivie,* 661 F.2d 62, 65-66 (5th Cir. 1981) [*19] (finding causal connection where defendants fraudulently induced plaintiff to sign agreement requiring him to sell stock at less than fair value upon termination and where, after obtaining agreement, defendants terminated plaintiff); *Dalicandro v. Legalgard, Inc.,* No. 99-3778, 2000 U.S. Dist. LEXIS 3089, at *8-9 (E.D. Pa. Mar. 16, 2000) (finding a sufficient connection where there was only one intermediate step between the fraud and the sale of stock).

The Court notes that, at the hearing on the motion to remand, it asked the parties to comment on the relevance of *Wilson v. First Houston Inv. Corp.,* 566 F.2d 1235 (5th Cir. 1978). There, the plaintiff filed a 10b-5 suit against his investment advisor, arguing that the transfer of control over his stock portfolio to the advisor satisfied the requirement that the alleged fraud be "in connection with the purchase and sale of securities." The Fifth Circuit concluded that "any purchase and sale which took place incident to this arrangement was too remote to satisfy the 'in connection with the purchase and sale' requirement as contemplated by *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975). [*20] " *Id.* at 1243. Given *Wilson,* it could be argued that, in the instant case, the mere authorization for issuance of more stock options is too remote or speculative to satisfy the requirement that the recommendation, position, or communication be "with respect to the sale of securities."

The Court, however, finds *Wilson* inapposite. First, *Wilson* is in tension with the more recent Supreme Court decision *Merrill Lynch* and its progeny which have construed "in connection with." Also, at least one district court has found *Wilson* unconvincing because it does not contain a substantive analysis of the required "connection" for a 10b-5 claim. *See In re Catanella & E.F. Hutton & Co., Sec. Litigation,* 583 F. Supp. 1388, 1411 & n.32 (E.D. Pa. 1984) ("Without analysis, the [*Wilson*] court simply declared the fraud too remote from the transactions. Thus, *Wilson* lends little guidance."). More important, *Wilson* is factually distinguishable. In contrast to the general transfer of authority at issue in *Wilson,* here, it is alleged that the proxy solicitation was directly related to the option grants: shareholder authorization was a necessary predicate [*21] to further option grants

and was intended to facilitate such grants, and it was only one step away from any further grants. *See also Ambassador Hotel v. Wei-Chuan Inv.,* 189 F.3d 1017 (9th Cir. 1999) (finding a sufficient connection where the fraudulent solicitation concerned a joint venture agreement that did not mention stock but gave the newly formed corporation the ability to later issue stock).

Accordingly, the Court concludes that Mr. Unterberg's attempt to remove pursuant to SLUSA was not justified because Plaintiff's class action falls within the scope of the second Delaware carve-out.

B. 28 U.S.C. § 1441(b)

Although the Court concludes that removal pursuant to SLUSA was not warranted, Mr. Unterberg has articulated another basis for removal pursuant to 28 U.S.C. § 1441(b).

There is no dispute that Plaintiff could have filed suit in federal court based on diversity jurisdiction. Plaintiff is a citizen of Michigan and none of the Defendants are citizens of Michigan. Plaintiff, however, chose to file suit in state court. The question is whether removal under 28 U.S.C. § 1441(b) [*22] is proper.

Under 28 U.S.C. § 1441(b), a case in which the parties are completely diverse "shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b). Thus, in the instant case, if any Defendant who is properly joined and served were a citizen of California, the case would not be removed. The parties agree that at least some of the Defendants in this case -- including nominal Defendant EFI -- are citizens of California. However, none of these California Defendants had been served at the time of removal. Mr. Unterberg argues, therefore, that removal is proper because he is the only Defendant served (by virtue of his entering a general appearance) in the case, and he is not a citizen of California.

Plaintiff asserts that the strict language of § 1441(b) should not be applied to the instant case because doing so would not serve the purpose of § 1441(b) and in fact would reward gamesmanship on the part of Mr. Unterberg and the other Defendants. Plaintiff relies on *Holmstrom v. Harad,* No. 05 C 2714, 2005 U.S. Dist. LEXIS 16694 [*23] (N.D. Ill. Aug. 11, 2005) in which the district court explained:

> The purpose of the 'joined and served' requirement is to prevent a plaintiff from blocking removal by joining as a defendant a resident party *against whom it does not intend to proceed,* and whom it does not even serve. Defendants are entitled to

2007 U.S. Dist. LEXIS 21928, *

act to remove a case based on circum-
stances at the time they are sued, and are
not required to guess whether a named
resident defendant will ever be served.

*Id.* at *6 (emphasis added).

In the instant case, there is no dispute that all of the
California Defendants named in the case are parties
against whom Plaintiff does intend to proceed. Indeed,
for the derivative suit, Plaintiff must proceed against
EFI, a citizen of California. As in *Holmstrom,* the appar-
ent purpose of the "joined and served" requirement is not
served here. In fact, Mr. Unterberg, not Plaintiff, en-
gaged in gamesmanship by acting preemptively to re-
move before Plaintiff effectuated service on the Califor-
nia Defendants (in particular, EFI). The gamesmanship
by the Defendants, according to Plaintiff, is especially
clear from the fact that, in one of the cases which was
related to the [*24] instant case, *see* Case No. 06-7274,
*all* of the California Defendants made appearances, not
just Mr. Unterberg, even though the same counsel repre-
sents those Defendants as well as Mr. Unterberg. The
decision to have only Mr. Unterberg enter an appearance
in this case was deliberate.

Plaintiff's argument is not without merit -- indeed,
has a great deal of appeal. The difficulty for Plaintiff is
that the language of § 1441(b) is clear, and a court may
depart from the plain language of a statute only under
"rare and exceptional circumstances." *Demarest v.
Manspeaker,* 498 U.S. 184, 190, 111 S. Ct. 599, 112 L.
Ed. 2d 608, (1991) ("When we find the terms of a statute
unambiguous, judicial inquiry is complete except in rare
and exceptional circumstances."), *superseded by statu-
tory amendment on other grounds,* 28 U.S.C.A. § 1821.
A court "look[s] beyond the express language of a statute
where a literal interpretation would thwart the purpose of
the overall statutory scheme or lead to an absurd or futile
result." *Albertson's, Inc. v. Commissioner of Internal
Revenue,* 42 F.3d 537, 545 (9th Cir. 1994) (internal quo-
tation marks omitted).

The Court cannot say [*25] that, in the instant case,
strict adherence to the language of § 1441(b) would lead
to absurd or futile results. Plaintiff suggests that reward-
ing Mr. Unterberg's gamesmanship would render an ab-
surd result. However, the Court notes that the games-
manship of Mr. Unterberg is somewhat overstated. Mr.
Unterberg did not make a general appearance and re-
move the case to federal court until approximately two
weeks after Plaintiff filed the complaint. Plaintiff there-
fore had an opportunity to serve the complaint on any of
the California Defendants, including the corporate de-
fendants. Plaintiff should have been cognizant of the fact
that a nonresident defendant could remove a case without

having been served. *See Delgado v. Shell Oil Co.,* 231
F.3d 165, 177 (5th Cir. 2000) ("Generally, service of
process is not an absolute prerequisite to removal.").

Plaintiff points out that, "even when the plain mean-
ing did not produce absurd results but merely an unrea-
sonable one 'plainly at variance with the policy of the
legislation as a whole,' [the Supreme Court] has followed
that purpose, rather than the literal words." *United States
v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.
Ct. 1059, 84 L. Ed. 1345 (1940) [*26] (finding that a
literal interpretation of the Motor Carrier Act would give
the Commission power to make employment decisions
that were broader than intended by Congress); *see also
Albertson's.,* 42 F.3d at 537. Even under the *American
Trucking* standard, the Court cannot conclude that strict
adherence to the language of § 1441(b) would be plainly
at variance with the policy behind the statute. While
*Holmstrom* articulates a logical analysis of the purpose
of the joined and served requirement, if Congress had
wanted to ensure that removal would not be appropriate
until it was clear that Plaintiff was trying to prevent re-
moval by speciously naming resident defendants, Con-
gress could have provided that no removal petition could
be filed until one or more nonresident defendant had
been joined and served. The statute also could have been
written to give a plaintiff, *e.g.,* 30 or 60 days to effect
service before permitting a defendant to remove. In any
event, Plaintiff has not cited anything in the legislative
history of § 1441(b) to support its assertion that the plain
language of the statute should be disregarded. And, sig-
nificantly, *Holmstrom's* decision [*27] to disregard the
plain language of § 1441(b) has been disapproved by
other courts. *See Massey v. Cassens & Sons, Inc.,* No.
05-CV-598-DRH, 2006 U.S. Dist. LEXIS 9675, at *10
(S.D. Ill. Feb. 16, 2006) ("While an argument can be
made that the likely policy underlying the 'joined-and-
served' requirement is not implicated by the current facts,
the Court is constrained by the language of 28 U.S.C. §
1441. That language is clear and unambiguous: where
complete diversity is present -- as it is in this case -- only
the presence of a 'joined-and-served' resident defendant
defeats removal."); see also *Davis v. Cash,* No. 3:01-CV-
1037-H, 2001 U.S. Dist. LEXIS 15546 (N.D. Tex. Sept.
27, 2001) (granting removal where individual nonresi-
dent defendant entered a general appearance by filing an
answer before any defendants had been served).

Finally, whether Mr. Unterberg had been "served"
by virtue of his voluntary general appearance in state
court, Cal. Code Civ. Proc. § 410.50(a) (providing that
"[a] general appearance by a party is equivalent to per-
sonal service of summons on such party"), is immaterial.
Procedurally, Mr. Unterberg could [*28] remove
whether or not he had been "served." *See Delgado,* 231
F.3d at 177 (5th Cir. 2000) ("Generally, service of proc-

2007 U.S. Dist. LEXIS 21928, *

ess is not an absolute prerequisite to removal."); *Massey,* 2006 U.S. Dist. LEXIS 9675, at *6 ("Nothing in 28 U.S.C. § 1441 or any other statute requires defendants to have been served themselves prior to removing a case to federal court"). Substantively, § 1441(b)'s "joined and served" requirement focuses on resident defendants, not nonresident defendants like Mr. Unterberg.

Accordingly, the Court, constrained by the plain language of § 1441(b), concludes that removal by Mr. Unterberg was appropriate.

C. Attorney Fees and Costs

Because the Court denies Plaintiff's motion to remand, Plaintiff's request for attorney fees and costs is likewise denied.

**III. CONCLUSION**

For the foregoing reasons, the Court concludes that removal pursuant to SLUSA was not appropriate but that removal pursuant to § 1441(b) was proper. Accordingly, Plaintiff's motion to remand is denied.

This order disposes of Docket No. 7.

IT IS SO ORDERED.

Dated: March 9, 2007

EDWARD M. CHEN

United States Magistrate [*29] Judge