**Tab 12**

LEXSEE 54 BUS LAW 1

Copyright (c) 1998 American Bar Association
The Business Lawyer

November, 1998

54 Bus. Law. 1

LENGTH: 28221 words

**SECTION:** ARTICLE: THE SECURITIES LITIGATION UNIFORM STANDARDS ACT OF 1998: THE SUN SETS ON CALIFORNIA'S BLUE SKY LAWS.

**AUTHOR:** David M. Levine and Adam C. Pritchard *

* Mr. Levine is Senior Advisor to the Director of Enforcement, U.S. Securities and Exchange Commission (SEC or Commission), formerly, Special Assistant to the SEC's General Counsel. Mr. Pritchard is Assistant Professor, University of Michigan Law School, formerly, Senior Counsel in the SEC's Office of General Counsel. Both authors assisted in preparing the SEC's response to prior versions of the preemption bill discussed in this Article.

The SEC, as a matter of policy, disclaims responsibility for any private publication or statement by any of its employees. The views expressed herein are those of the authors and do not necessarily reflect the views of the Commission or of the authors' colleagues on the staff of the Commission. 17 C.F.R. § 200.735-4(e)(2) (1998).

The authors thank Richard H. Walker, Director of Enforcement at the Commission, for his support and numerous suggestions. The authors also wish to thank Ross Albert, Frank Balotti (the referee), Joan Larsen, Gordon Seymour, and Erika Singer for editorial suggestions on previous drafts of this Article, Eeva Joensuu for excellent word processing, and Wallace Rogers for helping us keep our sources straight.

**TEXT:**

## INTRODUCTION

It is often said that California sets the pace for changes in America's tastes. Trends established in California often find their way into the heartland, having a profound effect on our nation's cultural scene. Nouvelle cuisine, the dialect of the Valley Girl and rollerblading all have their genesis on the West Coast. The most recent trend to emerge from California, instead of catching on in the rest of the country, has been stopped dead in its tracks by a legislative rebuke from Washington, D.C. California's latest, albeit short-lived, contribution to the nation was a migration of securities fraud class actions from federal to state court.

This migration had its origin in Washington, D.C., not Los Angeles. Less than three years ago, Congress passed the Private Securities Litigation Reform Act of 1995 (Reform Act, Act, or PSLRA). n1 The corporate lobby and professionals who serve corporations persuaded Congress that companies and their managers were being harassed by class action lawyers more concerned with a case's settlement value (and potential attorneys' fees) than its merits. n2 In response to that perceived abuse, Congress enacted the Reform Act, a series of primarily procedural measures making it more difficult to bring securities fraud class actions. n3

n1 Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified as amended in scattered sections of 15 U.S.C.).

© ABA, The Business Lawyer, November, 1998

n2 This was Congress' position. The authors express no view on whether the evidence presented to Congress supports the conclusion that frivolous securities litigation was a substantial problem. In addition, please note that, while this Article discusses certain litigation tactics employed by the plaintiffs' bar post-Reform Act, these tactics were permissible by law and within the scope of the ethics rules.

n3 *See* Private Securities Litigation Reform Act of 1995, 109 Stat. 737; *see also* Statement of Managers-- The "Private Securities Litigation Reform Act of 1995," 141 CONG. REC. H13699 (daily ed. Nov. 28, 1995) [hereinafter Statement of Managers] ("The private securities litigation system is too important to the integrity of American capital markets to allow this system to be undermined by those who seek to line their own pockets by bringing abusive and meritless suits."). Other than clarifying that the SEC has aiding and abetting authority, the Reform Act does not apply to Commission actions.

Three years after its passage, the Act has greatly altered the course of securities litigation; however, its effect on capital formation and investor protection remains uncertain. One result of the Reform Act became clear soon after its passage although it seems not to have been anticipated by Congress. The Act's sweeping reform, directed largely at securities fraud class actions brought in federal court, leaves state securities fraud actions untouched. n4 Class action lawyers sought to avoid the restrictions imposed by the Reform Act by resorting to state law actions brought in state court. The majority of the state class actions filed since passage of the Reform Act have been filed in California. n5 The first part of this Article assesses the evidence showing a migration to California state court. n6 The authors conclude that claims regarding the magnitude of migration to state court were overblown, but that parallel state and federal cases were a serious problem for corporate issuers forced to defend such dual-track litigation and that state liability concerns threatened to undermine the Reform Act's safe harbor for forward-looking statements. n7

n4 *See* Michael A. Perino, *Fraud and Federalism: Preempting Private State Securities Fraud Causes of Action*, 50 STAN. L. REV. 273, 287 (1998) ("For the most part, . . . Congress seems to have viewed litigation reform as a federal problem that required a federal solution.").

n5 *See infra* notes 48-50 and accompanying text.

n6 *See infra* notes 16-50 and accompanying text.

n7 *See infra* notes 51-66 and accompanying text.

The rise of state court class actions led California-based issuers, particularly high-technology companies located in Silicon Valley, to Washington seeking further legislation restricting such suits. n8 Shifting securities fraud litigation to state court, they argued, would undermine the effectiveness of the Reform Act. Congress once again responded by recently passing the Securities Litigation Uniform Standards Act of 1998 (Uniform Standards Act), which preempts most securities fraud class actions brought in state court. n9 The President signed the Uniform Standards Act into law on November 3, 1998. n10

n8 *See* Leslie Eaton, *The Silicon Valley Gang; An Influential Industry With Lots of Money Is Getting Its Way on Capitol Hill*, N.Y. TIMES, June 11, 1998, at D1. The main lobbying group for preemption, comprised primarily of Silicon Valley representatives, is known as the "Uniform Standards Coalition." *Id.*

n9 S. 1260, 105th Cong. (1998). The Senate passed an earlier version of Senate Bill 1260 on May 13, 1998. On July 22, 1998, the House passed an amended version of Senate Bill 1260 which struck all information after the enacting clause and inserted instead the provisions of House Bill 1689. On July 29, 1998, the Senate announced its disagreement with the House's amendment to Senate Bill 1260 and requested a conference. The House agreed to a conference. On October 9, 1998, a conference report on Senate Bill 1260 was filed. *See* H.R. CONF. REP. 105-803 (1998).

n10 Pub. L. No., 105-353, 112 Stat. 3227 (1998) (to be codified in scattered sections of 15 U.S.C.).

© ABA, The Business Lawyer, November, 1998

The second part of this Article addresses the Uniform Standards Act and its likely effects on securities fraud class actions. n11 Congress did not pass a law simply precluding all state securities actions. Instead, the final product was considerably more complex, preempting only certain categories of class actions. The Uniform Standards Act includes a unique definition of "class action," coverage limited to nationally traded securities and a number of carve-outs from the general preemptive effect of the statute. This Article looks behind the sparse legislative reports for the bills to help shed light on the statute's complexities. This Article discusses the concerns raised by the Commission, the Uniform Standards Coalition, the securities bar, and academics, and how those concerns shaped the main provisions of the Uniform Standards Act. n12 The Article also offers predictions on how the Act is likely to be interpreted. n13

   n11 *See infra* notes 94-175 and accompanying text.

   n12 *See infra* text accompanying notes 103-72

   n13 *See infra* text accompanying notes 99-175.

The Uniform Standards Act makes federal antifraud provisions, governed by the Reform Act, the exclusive national standard for most securities fraud class actions. The securities litigation reform movement, both in 1995 and in 1998, sought to strike a new balance between capital formation and investor protection. The Reform Act adjusted that balance in a way that favored corporate issuers by placing limits on federal securities class actions. Most state blue-sky laws, by contrast, afford investors broader relief than currently available under federal law, including longer statutes of limitations and aiding and abetting liability. n14 The Uniform Standards Act seeks to bolster a number of the Reform Act's principal provisions by eliminating the recourse of most investors to state law remedies. Thus, it provides an appropriate occasion to address the current status of the national standard under federal law to evaluate whether capital formation and investor protection concerns remain properly balanced. In order to assess that national standard, this Article discusses the most recent data on the effect of the Reform Act, including certain developments which, if continued, could mean that the national standard bars certain meritorious claims. n15 This Article focuses, in particular, on the threat to recklessness as the scienter standard for pleading and proving securities fraud.

   n14 *See Oversight Hearing on Securities Litigation Abuses Concerning S. 1260, The Securities Litigation Uniform Standards Act of 1997, Before the Subcomm. on Sec. of the Senate Comm. on Banking, Hous., and Urban Affairs*, 105th Cong. 19-20 (Oct. 29, 1997) [hereinafter *October 29 Hearing*] (noting that 49 states allow for some form of aiding and abetting liability and 33 states have statutes of limitations longer than the federal period).

   n15 *See infra* notes 176-273 and accompanying text.

Finally, this Article assesses the likely effectiveness of the Uniform Standards Act in creating a national standard and concludes that while the Uniform Standards Act should afford issuers more certainty as to liability exposure, a genuine national standard is unlikely to emerge. Institutional investors continue to be able to proceed against issuers in state court, but small investors cannot afford to bring individual actions in state court. This preferential access for large investors means that the Uniform Standards Act is unlikely to create a single national standard. Rather, the Uniform Standards Act creates a "two-tiered" justice system, favoring institutional investors and wealthy individuals with superior state remedies. Small investors are relegated to the rigorous standards set by federal law for bringing class actions.

### THE REFORM ACT AND REACTION: MIGRATION TO STATE COURT

#### THE REFORM ACT

The Reform Act significantly rewrote the rules governing private federal securities fraud lawsuits. The Act raised the bar at several points in the litigation process, making it more difficult for plaintiffs to bring these actions. Its key provisions include the following:

*Heightened pleading standards:* Plaintiffs must plead facts giving rise to a "strong inference" that the defendant acted with the required state of mind for fraud. In addition, if pleading on information and belief, plaintiffs are required to state all facts underlying those beliefs. n16

© ABA, The Business Lawyer, November, 1998

*Stay of discovery:* Plaintiffs have no access to discovery while a motion to dismiss is pending under most circumstances. As a practical matter, the discovery stay ensures that every complaint will be met by a motion to dismiss and plaintiffs can no longer use discovery to frame an adequate complaint. n17

*Safe harbor for forward-looking information:* Unrealized material forecasts are not subject to liability if the forecast was accompanied by meaningful cautionary language or the forecast was not knowingly false when made. n18

*Lead plaintiff presumption:* The Reform Act designates as the most adequate plaintiff the plaintiff or group of plaintiffs having the largest financial stake in the case. The most adequate plaintiff selects class counsel subject to court approval. This provision is designed to encourage institutional investors to take charge of securities class actions. n19

n16 Securities Exchange Act of 1934 (Exchange Act) § 21D(b)(1), 15 U.S.C. § 78-u4(b)(2) (1994 & Supp. II 1996).

n17 Exchange Act § 21D(b)(3)(B), 15 U.S.C. § 78-u4(b)(3)(B).

n18 Exchange Act § 21E, 15 U.S.C. § 78u-4(g)(10).

n19 Exchange Act § 21D(a)(3), 15 U.S.C. § 78u-4(a)(3)(B)(i)(2)(iii)(I).

Other significant provisions include a mandatory Rule 11 n20 inquiry at the conclusion of each case n21 and proportionate, as opposed to joint and several, liability for defendants who acted with a less-than-knowing state of mind (i.e., recklessness). n22

n20 FED. R. CIV. P. 11.

n21 *See* Exchange Act § 21D(c)(2), 15 U.S.C. § 78u-4(c)(1). Sanctions were imposed recently for the first time pursuant to this provision. In *Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc.*, 985 F. Supp. 427, 433 (S.D.N.Y. 1997), the plaintiff filed an action alleging violations of Exchange Act Rule 10b-13 (17 C.F.R. § 240.10b-13 (1998)) and seeking injunctive relief. The rule places restrictions on the conduct of those making tender offers. The plaintiff and its counsel were each fined $ 50,000 for failing to address a precedent holding that there is no private right of action under Rule 10b-13. Moreover, the plaintiff failed to recognize that the transaction at issue was a merger, not a tender offer. All previous inquiries under this provision had resulted in decisions by the court not to impose sanctions. *See* Scott v. Sheingold, 1998 U.S. Dist. LEXIS 15810 (N.D. Ill. Sept. 30, 1998); Richter v. Achs, 174 F.R.D. 316, 319 (S.D.N.Y. 1997); *In re* Westinghouse Sec. Litig., 982 F. Supp. 1031, 1036-37 (W.D. Pa. 1997); Steckman v. Hart Brewing, Inc., No. 96-1077-k (S.D. Cal. Dec. 24, 1996) (order granting the defendant's motion to dismiss) (on file with *The Business Lawyer*, University of Maryland School of Law).

n22 Exchange Act § 21D(g), 15 U.S.C. § 78u-4(g)(2)(4), (g)(2)(B)(i), (g)(10).

The Reform Act continues a judicial trend toward narrowing the availability of relief for investors under the federal securities laws. A number of U.S. Supreme Court cases decided over the last two decades have limited the rights and remedies available under the federal securities laws. n23 Most notable are two recent decisions holding that there is no private right of action for aiding and abetting a violation of section 10(b) of the Exchange Act and imposing a short statute of limitations for anti-fraud actions. n24 The combined effect of legislative and judicial reforms has made it increasingly difficult for investors to sue under the federal securities laws.

n23 *See* Dirks v. SEC, 463 U.S. 646, 667 (1983) (holding that, absent a duty to disclose, a tippee's use of material nonpublic information does not violate § 10(b)); Aaron v. SEC, 446 U.S. 680, 701 (1980) (holding that scienter is a required element of a § 10(b) action); Chiarella v. United States, 445 U.S. 222, 235 (1980) (concluding that silence, absent a duty to disclose, does not violate § 10(b)); Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479-80 (1977) (concluding that absent deception, misrepresentation, or nondisclosure, acts of corporate

© ABA, The Business Lawyer, November, 1998

mismanagement do not violate § 10(b)); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201 (1976) (holding that scienter is a required element of a private § 10(b) action); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-33 (1975) (holding that a private action under Rule 10b-5 may only be brought by actual purchasers or sellers of securities); *see also* Richard H. Walker & David M. Levine, *The Limits of Central Bank's Textualist Approach--Attempts to Overdraw The Bank Prove Unsuccessful*, 26 HOFSTRA L. REV. 3 (1997).

n24 Central Bank v. First Interstate Bank, 511 U.S. 164 (1994) (aiding and abetting); Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991) (statute of limitations).

*NEWFOUND INTEREST IN STATE COURTS*

These restrictions on federal relief provoked new interest in state law, and a corresponding response to close off that alternative to federal law. Two phenomena, both centered in California, were the catalysts for the preemption movement that culminated in the Reform Act. The first was Proposition 211, n25 a plaintiff-friendly California ballot initiative that would have greatly expanded private rights of action under California's securities law. The second was the "migration" of securities class actions from federal to state court in the wake of the Reform Act's tough new standards for federal cases. n26

n25 1996 Cal. Legis. Serv. Prop. 211 (West).

n26 *See infra* notes 36-50 and accompanying text.

*Proposition 211*

Proposition 211 would have made California courts a utopia for the plaintiffs' bar. The proposition's most controversial provisions included the following: the extension of the fraud-on-the-market presumption of reliance to common law fraud actions, in which punitive damages are available; n27 the imposition of liability on those who "participated or assisted" in a fraud; n28 mandatory punitive damages when the conduct involved was "willful, outrageous, or despicable;" n29 joint and several liability for all defendants; a bar preventing issuers from indemnifying any of their officers or directors; and no cap on attorneys' fees. n30 The proposition was regarded as a blatant attempt by the plaintiffs' bar to counteract the Reform Act. n31 Unfortunately for its advocates, their effort backfired: after being rejected by California's voters, Proposition 211 launched the preemption movement that led to the Uniform Standards Act.

n27 1996 Cal. Legis. Serv. Prop. 211 § 2.

n28 *Id.* § 3.

n29 *Id.* § 4.

n30 *Id.* § 5.

n31 *See* Neil A. Lewis, *California Measure Could Trump U.S. Law on Securities Suits*, N.Y. TIMES, Apr. 30, 1996, at A13.

Proposition 211 ignited a firestorm of opposition nationwide. Both sides spent extravagantly, making it the most expensive ballot initiative in California's history. n32 If passed, its extreme provisions would have chilled corporate disclosure. n33 The measure was soundly defeated by a three-to-one margin, n34 but even before the votes were counted, opponents of the initiative were considering alternative strategies in the event it passed. The strategy chosen was a legislative initiative that would preempt Proposition 211 and any other similar measures adopted in other states. Proposition 211 opponents, fresh from their victory at the California ballot box, turned their attention to Washington, D.C., seeking federal legislation to ensure that similar initiatives did not resurface in any state. n35

n32 *See* David S. Jackson, *Litigation Valley*, TIME, Nov. 4, 1996, at 72 ("The battle over Proposition 211 is already the most expensive ballot initiative in history. Nearly $ 46 million has been spent so far, the bulk coming from opponents, including the Big Six accounting firms and high-tech firms from Apple to Xilinx.").

n33 *See, e.g.*, Louise Kehoe, *Intel to Stop Publishing Business Forecasts*, FIN. TIMES, Oct. 9, 1996, at 32 (stating that the potential passage of Proposition 211 caused Intel to cease making forecasts).

n34 *See* Elizabeth Corcoran, *California Voters Reject Proposition 211*, WASH. POST, Nov. 7, 1996, at D3.

n35 *See October 29 Hearing, supra* note 14, at 37 ("Without a national standard for liability, the potential threat is always there that one state will change its laws in such a way as to become the haven for litigation. This almost happened in California last year with Proposition 211. The potential remains it could successfully happen elsewhere in the future.") (statement of Senator Christopher Dodd). The fear that measures similar to Proposition 211 would be introduced in other states has so far proved to be unfounded. So far as the authors are aware, there have been no efforts made to liberalize the blue sky laws of any other state.

### Migration or Not?

The preemption movement was also fueled by the so-called migration of securities class actions from federal to state court in the wake of the Reform Act. Preemption proponents argued that the goals of the Reform Act were being thwarted by a movement of litigation activity to state court, where the Act does not apply:

> I'm very proud of the fact that in the last Congress . . . we were able to pass a piece of legislation aimed at doing something about this situation that had arisen where we had especially new growth companies plagued with lawsuits, often being forced to settle out of court, . . . creating a system of parasites who were literally bleeding the life blood out of growth companies in America. . . . We discovered . . . that [there] has simply been a shift of all these lawsuits into state court. n36

In particular, preemption proponents alleged that state courts were being used to circumvent the Reform Act's safe harbor for forward-looking statements, discovery stay, n37 and its heightened pleading standards. n38

n36 *October 29 Hearing, supra* note 14, at 4, 6 (statement of Senator Phil Gramm).

n37 *See infra* notes 51 & 54 and accompanying text.

n38 *See* Perino, *supra* note 4.

Three studies have attempted to count securities class actions in state courts before and after the Reform Act. n39 The only consistent finding among the studies is that in 1996, the first year following passage of the Act, state filings increased, and in 1997 the number materially decreased. n40 The studies diverge concerning the number of suits, if any, filed in state court in the years leading up to the Reform Act. n41 Accordingly, it remains unclear if the state court filings in 1996 represented a "migration" by plaintiffs to state court. If the filing of state court class actions was not a new phenomenon, it is difficult to infer that the state court filings represented an attempt to circumvent the Reform Act. It also remains unclear whether the number of state suits witnessed in 1997 has returned to pre-Act levels. The findings of the studies are as follows:

### Number of State Court Securities Class Actions

[SEE TABLE IN ORIGINAL]

The results are too inconsistent to draw any policy prescriptions from them. According to both the National Economic Research Associates (NERA) and Price Waterhouse studies, the number of securities class actions filed in state court in

© ABA, The Business Lawyer, November, 1998

1997 is on par with the number filed prior to the Reform Act. In fact, NERA issued a press release stating that the 1996 trends in the number of state class action filings were "transient." n44 Moreover, according to the Price Waterhouse study, it is unclear if the number ever increased post-Reform Act. Price Waterhouse's data equates to an average of 55 securities class actions filed per year in state court during 1996 and 1997; the average number filed per year from 1991 through 1995 was approximately 49. n45 The authority of the numbers is further undermined by the fact that Price Waterhouse, in a letter to Senator Alfonse D'Amato, restated its count on the eve of a Senate hearing on the Uniform Standards Act. n46 Claiming that the methodology employed by Securities Class Action Alert, the service it used to provide the figures, was flawed, Price Waterhouse's revised figures display that the average number of state suits filed in 1996 and 1997 grew 355% over the 1991 to 1995 average. n47

n39 JOSEPH A. GRUNDFEST & MICHAEL A. PERINO, SECURITIES LITIGATION REFORM: THE FIRST YEAR'S EXPERIENCE (1997) [hereinafter STANFORD STUDY]; DENISE N. MARTIN ET AL., NATIONAL ECONOMIC RESEARCH ASSOCIATES, RECENT TRENDS IV: WHAT EXPLAINS FILINGS AND SETTLEMENTS IN SHAREHOLDER CLASS ACTIONS? (1996) [hereinafter NERA STUDY]; PRICE WATERHOUSE, PRICE WATERHOUSE LITIGATION REFORM STUDY (1997) (on file with *The Business Lawyer*, University of Maryland School of Law) [hereinafter PRICE WATERHOUSE STUDY].

n40 *See* STANFORD STUDY, *supra* note 39, at 8; NERA STUDY, *supra* note 39, at Table 4; and PRICE WATERHOUSE STUDY, *supra* note 39, at 1.

n41 *See* STANFORD STUDY, *supra* note 39, at 8; NERA STUDY, *supra* note 39, at Table 4; and PRICE WATERHOUSE STUDY, *supra* note 39, at 1.

n42 The Stanford Study analyzes the number of state filings in 1996 only. STANFORD STUDY, *supra* note 39, at 8. As for years prior to passage of the Act, the Stanford Study notes, "Counsel with substantial experience in litigating securities fraud matters suggest that the volume of class action securities fraud litigation in state court has, until passage of the Reform Act, been *de minimis.*" *Id.* at 7.

n43 Annualized figure based on January to April 1997 data.

n44 Press Release, NERA, *Federal Shareholder Class Action Filings Rise to Pre-Reform Act Levels As State Filings Fall* (1997) (on file with *The Business Lawyer*, University of Maryland School of Law).

n45 PRICE WATERHOUSE STUDY, *supra* note 39, at 1.

n46 Letter from Daniel V. Dooley, Partner, Price Waterhouse L.L.P., to Senator Alfonse M. D'Amato, Chairman, Senate Banking, Hous. & Urban Affairs Comm. (Feb. 20, 1998) (on file with *The Business Lawyer*, University of Maryland School of Law).

n47 *Id.* at 2. The letter does not clearly explain the flaw but it appears Price Waterhouse is claiming Securities Class Action Alert did not properly account for parallel federal-state filings. *Id.* at 1.

Whether or not there has been a migration of class actions to state court in the wake of the Reform Act, such litigation is highly concentrated in just one state: California. On August 17, 1998, the Securities Class Action Clearinghouse, administered by the Stanford University Law School, listed 120 class actions filed in state court during 1996 and 1997. n48 Of the 120, the state in which the action was filed could be discerned for 78. The overwhelming majority of these-- fifty-seven--were filed in California. n49 Accordingly, approximately 73% of the state class actions were filed in California. n50

© ABA, The Business Lawyer, November, 1998

n48 Robert Crown Law Library, Stanford University School of Law, Securities Class Action Clearinghouse: State Court Cases: State Court Securities Class Actions (last modified Aug. 17, 1998) <http://securities.stanford.edu>.

n49 None of the other 13 states where securities class actions were filed during these same years comes close to California in number of suits filed: Arizona (2), Colorado (1), Florida (2), Georgia (2), Illinois (3), Maryland (1), Minnesota (1), Montana (1), New Jersey (1), New York (3), Ohio (1), Texas (2), and Tennessee (1). *Id.*

n50 *See also Oversight Hearing on Securities Litigation Abuses, Before the Subcomm. on Sec. of the Senate Comm. on Banking, Hous., and Urban Affairs*, 105th Cong. 36 (July 24, 1997) (testimony of Arthur Levitt, Chairman, SEC) (noting that as of July 24, 1997, approximately 60% of the state securities class actions had been filed in California).

## PROBLEMS CREATED BY THE MIGRATION

### Circumvention of the Discovery Stay

The most problematic aspect of the migration has been the filing of parallel lawsuits, one at the state level and a second at the federal level. Discovery obtained in the state case may then be used in the federal case where it would otherwise be unavailable due to the federal discovery stay. n51 Of the 280 federal securities class actions filed during 1996 and 1997, 51 (18%) can be tied to a parallel state case. n52 The number of parallel actions abated slightly in 1997. Thirty-one of the 105 (30%) federal class actions filed during 1996 had a state counterpart, but only 20 of the 175 (12%) federal class actions filed during 1997 had a companion state case. n53 The majority of the 51 parallel state cases (32 of the 51 (63%)) were brought in one state: California.

n51 *See* Edward Brodsky, *Discovery Abuses: A Shifting Target?*, N.Y. L.J., Apr. 9, 1997, at 3 ("[A] plaintiff can file an action in state court and secure substantial discovery barred by the Reform Act. Based on its findings through discovery, plaintiff could then determine whether to maintain the state action, file a parallel proceeding in federal court or dismiss the state action in favor of the federal action.").

n52 *See* Karen Donovan, *Full Stop for Fraud Suits in States?*, NAT'L L. J., Mar. 23, 1998, at A1 (reporting SEC's numbers on parallel federal and state suits).

n53 *Id.*

These parallel lawsuits are difficult to justify: they create wasteful duplication and undermine Congress' purposes in enacting the discovery stay. While the authors were preparing the SEC's Report to the President and Congress on the First Year of Practice Under the Private Securities Litigation Reform Act of 1995, a number of issuers reported that defending on two fronts has made securities litigation more expensive than ever. n54 Moreover, there is reason to believe that the incidence of dual-track litigation would have continued to increase but for the Uniform Standards Act. A recent California state appellate decision, *Oak Technology v. Superior Court of Santa Clara*, n55 encourages plaintiffs' lawyers to pursue this tactic more aggressively. *Oak Technology* represents the first ruling by a state appellate court on the issue of whether a state trial court should stay discovery in a securities action when a parallel federal suit has been filed. n56 California trial courts, as in all other states, have the discretion to stay the state case in favor of the parallel federal case. n57 The *Oak Technology* appellate court consolidated for review three separate cases in which the trial court refused to stay discovery. n58 Pursuant to a deferential standard of review--abuse of discretion--the *Oak Technology* appellate court affirmed the rulings by the lower courts. n59

n54 SEC, OFFICE OF THE GENERAL COUNSEL, REPORT TO THE PRESIDENT AND THE CONGRESS ON THE FIRST YEAR OF PRACTICE UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 (1997) [hereinafter SEC STAFF REPORT]; *see also* Bill Kisliuk, *Are Two Securities Cases Better Than One?*, RECORDER, July 14, 1997, at 1 (citing an estimate by defense counsel that the cost of pretrial proceedings has increased by approximately 33% as a result of dual-track litigation).

© ABA, The Business Lawyer, November, 1998

n55 Super. Ct. No. CV758510 (Cal. Ct. App. Aug. 14, 1997) (on file with *The Business Lawyer*, University of Maryland School of Law).

n56 The authors are aware of nine trial court rulings on whether state court discovery should be stayed. The decisions are split. Goldman v. Filenet Corp., Case No. 773245 (Cal. Super Ct., Orange County Jan. 20, 1998) (imposing stay) (on file with *The Business Lawyer*, University of Maryland School of Law); Sperber v. Bixby (the "Brooktree Class Action"), Case No. 699812 (Cal. Super. Ct., San Diego County Oct. 18, 1996) (imposing stay) (on file with *The Business Lawyer*, University of Maryland School of Law); Ohrstrom, Jr. v. Harris Trust Co., 1997 Del. Ch. LEXIS 162 (Del. Ch. Oct. 17, 1997) (imposing stay because it would not prejudice the plaintiff and would result in savings to the defendant, without mention of the parallel federal action); Adler v. Prism Solutions, Inc., Case No. CV764547 (Cal. Super. Ct., Santa Clara County May 27, 1997) (denying stay) (on file with *The Business Lawyer*, University of Maryland School of Law); Werczberger v. Stormedia, Inc., No. CV760825 (Cal. Super. Ct., Santa Clara County Dec. 31, 1996) (denying stay) (on file with *The Business Lawyer*, University of Maryland School of Law); David S. Gilfand, Ltd. Profit Sharing Plan v. Nutrition for Life Int'l, Inc. (Tex. Dist. Ct., Harris County Dec. 11, 1996) (denying stay) (on file with *The Business Lawyer*, University of Maryland School of Law); Lee v. IMP, Inc., CV 760793 (Cal Super. Ct., Santa Clara County Dec. 11, 1996) (denying stay) (on file with *The Business Lawyer*, University of Maryland School of Law); Esner v. Szawlwinski, Case No. 978584 (Cal. Super. Ct., San Francisco County Oct. 21, 1996) (denying stay) (on file with *The Business Lawyer*, University of Maryland School of Law); Milano v. Auhll, No. SB 213 476 (Cal. Super. Ct., Santa Barbara County Oct. 2, 1996) (imposing stay, primarily because case included a Securities Act claim) (on file with *The Business Lawyer*, University of Maryland School of Law).

n57 *See* Landis v. North Am. Co., 299 U.S. 248, 254 (1936) ("The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel and for litigants."); *see also* CAIFA Prof'l Law Corp. v. State Farm Fire & Cas. Co., 15 Cal. App. 4th 800, 804 (Cal. App. Ct. May 7, 1993) ("It is black letter law that, when a federal action has been filed covering the same subject matter as is involved in a California action, the California court has the discretion but not the obligation to stay the state court action.").

n58 *Oak Technology*, Super. Ct. No. CV758510.

n59 *Id.* at 10-11.

In affirming the lower courts, the appellate court was swayed by its belief that California state law affords plaintiffs broader relief than federal law, including a private cause of action for aiding and abetting, as well as punitive damages for some state fraud claims. n60 The court rejected the defendants' arguments that a stay of the state court action would eliminate duplicative litigation because all of the claims could be heard in federal court through the use of pendent jurisdiction. n61 The court noted that "the underlying themes of these petitions is the view that real parties in interest are circumventing the [PSLRA]," but found that "the theme is irrelevant to our analysis because the current state of the law permits securities fraud plaintiffs to maintain dual-track litigation." n62

n60 *Id.* at 11-13 ("The bottom line is simply that it is rational to believe that real parties in interest's state actions afford them broader relief, resolution of the federal actions will therefore not resolve all the issues, so the state actions will proceed to decision in any event.").

n61 *Id.* at 9. Petitioners unsuccessfully sought review by the California Supreme Court.

n62 *Id.* at 8, 9.

Subsequent trial court decisions in California, however, have been more restrictive in allowing state court discovery in dual-track cases. For example, on two occasions, a creative California state court judge allowed discovery but im-

© ABA, The Business Lawyer, November, 1998

posed an "ethical firewall" preventing its use in the federal class action. n63 Notwithstanding these trial court developments, no appellate court decision prevents the use of state litigation to avoid the federal discovery stay. n64

n63 *See* Ferrari v. Read-Rite Corp., Case No. CV762735 (Cal. Super. Ct., Santa Clara County Jan. 6, 1998) (order granting defendants' motion for creation of ethical wall) (on file with *The Business Lawyer*, University of Maryland School of Law) ("In order to preserve defendants' rights under the PSLRA, and in accordance with principles of comity: . . . Pursuant to this order, no attorney representing plaintiffs in this lawsuit may disclose any information obtained through discovery in this action to any attorney representing plaintiff in the federal class action."); Howard Gunty, Inc. Profit Sharing Plan v. Quantum Corp., No. CV760370 (Cal. Super. Ct., Santa Clara County Oct. 16, 1997) (same) (on file with *The Business Lawyer*, University of Maryland School of Law); *see also* Phyllis L. Mason, *Is California's Ethical Discovery Firewall Here to Stay?*, DERIVATIVES LITIG. REP., Jan. 1, 1998, at 9 (discussing these cases).

n64 The Uniform Standards Act may not close this loophole because plaintiffs' lawyers could still obtain discovery in parallel individual state actions. *But see infra* notes 160-64 and accompanying text (discussing provision in Uniform Standards Act allowing federal judges to stay discovery in parallel state cases).

### Undermining of the Safe Harbor

A second problem raised by the migration to state court involves the Reform Act's safe harbor for forward-looking statements. Issuers have complained that they cannot take full advantage of the safe harbor provided by the Reform Act because they remain exposed to liability in state court. In fact, preemption advocates consistently raised the absence of a corresponding safe harbor in state court as a key argument. n65 It is difficult to square potential state court liability for forward-looking statements with Congress' purposes in enacting the safe harbor. At least in theory, if there is no safe harbor in state court, the federal safe harbor provides little, if any, comfort. More forward-looking information is likely to be disclosed if state court causes of action based on failed forecasts are preempted. In addition, as Congress found leading up to the Reform Act, class actions based on a failed forecast, i.e., "fraud-by-hindsight" cases, are the most prone to abuse. Accordingly, at least limited preemption of liability for statements protected by the safe harbor was essential to ensure that issuers did not lose the benefit of the safe harbor due to forum shopping by plaintiffs. n66

n65 *See October 29 Hearing, supra* note 14, at 50 ("Because of both the reality and the threat of state court suits, high technology companies are reluctant to rely on the federal safe harbor.") (statement of Robert Hinckley, Vice President, Xilinx Corp.); *id.* at 75 ("The conflicting state standards which govern private securities litigation fundamentally reduce a corporation's willingness to provide any forward-looking information to the public.") (statement of Daniel Cooperman, General Counsel, Oracle Corp.); *see also Written Testimony of Bruce G. Vanyo Before the Subcomm. on Fin. and Hazardous Materials of the House Comm. on Commerce*, 105th Cong. 5 (Oct. 21, 1997) ("As a result of plaintiffs' freely filing failed predictions cases in state court, where there is no safe harbor protection, public companies cannot be expected to make forward-looking statements, precisely contrary to Congress' intent in enacting the safe harbor.") (on file with *The Business Lawyer*, University of Maryland School of Law).

n66 This is especially so considering that the alternative protection afforded issuers by the "bespeaks caution" doctrine may not apply in state court actions. The judicially created "bespeaks caution" doctrine deems projections accompanied by adequate cautionary language immaterial as a matter of law. *See, e.g., In re* Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir. 1993). At least one state court has rejected the theory:

We recognize that 'the trend in [federal securities] law heavily favors' adopting the bespeaks caution doctrine. We also recognize that adopting the doctrine may prevent forum shopping between federal and state courts. Respondent, however, has not cited and we have not found a state court that has applied the bespeaks caution doctrine to dismiss state common law claims on the pleadings. We therefore conclude the district court erred in dismissing appellants' state common law claims for failing to state a claim upon which relief can be granted.

Bondholder's Recovery Team v. St. Therese Home, Inc., No. C7-93-982, 1993 Minn. App. LEXIS 1222, at * 2 (Minn. Ct. App. Dec. 14, 1993) (citation omitted). *But see* David v. Simware Inc., No. 602143-96, 1997 N.Y. Misc. LEXIS 201 (N.Y. Sup. Ct. Mar. 13, 1997) (allowing use of the bespeaks caution doctrine); Lagen v. Balcor Co., 653 N.E.2d 968 (Ill. App. Ct. July 27, 1995) (same).

### WAS THE CALIFORNIA MIGRATION LIKELY TO CONTINUE?

The concentration of state court litigation in California raises several questions ignored by Congress in passing the Uniform Standards Act. With such a disproportionate number of cases filed in California, it is fair to ask why corporate issuers did not seek reform in Sacramento rather than Washington. n67 Even more curious is why Congress acted so quickly to try to pass the Uniform Standards Act, given that months before any bills were introduced in Congress, a bill was introduced in the California legislature that would have imported the Reform Act provisions. n68 Passage of the state bill would have mooted any need for federal legislation--if the Reform Act applied in both federal and state fora, the incentive to migrate to state court would have been eliminated. Other states have already taken this step. n69

n67 *See* 144 CONG. REC. H6059 (daily ed. July 21, 1998).

There are 65 [securities class actions] in California. If they [the proponents of the bill] have got a problem in California, go to Sacramento. That is why we have State legislatures. . . . Why should we be voting on this? . . . They come to Washington. I do not get it. We do not have a problem in Massachusetts. By the way, none in Pennsylvania, Virginia, Louisiana, across most of the country, no suits. What are we doing here?

*Id.* (statement of Rep. Edward Markey).

n68 S. 35, 1997-98 Reg. Sess. (Ca. 1997) (introduced by Senator John Vasconcellos on Dec. 2, 1996).

n69 Arizona, Montana, and Ohio have passed such laws. ARIZ. REV. STAT. §§ 44-2081-2087 (1996); MONT. CODE ANN. § 3-10-319 (1997); OHIO REV. CODE ANN. §§ 1707.432.438 (1997).

Preemption proponents responded that if California adopted the Reform Act, the action would simply have shifted to one of the forty-nine other states. n70 For several reasons, however, this argument is unconvincing. Two factors, whose confluence is only present in California, account for that state's popularity as a venue for class actions. n71 First, California is home to a high percentage of high-technology companies, n72 the type of issuer most frequently named in class actions. n73 In fact, the high-technology industry led the lobbying effort for preemption. n74 Second, California's blue sky law is unusual in that it appears to offer a fraud cause of action not requiring proof of individualized reliance. n75 Elimination of this requirement facilitates class actions because reliance ordinarily requires individualized proof.

n70 The authors have had several conversations with congressional staffers on this point.

n71 *See* Richard H. Walker et al., *The New Securities Class Action: Federal Obstacles, State Detours*, 39 ARIZ. L. REV. 641, 678 (1997).

n72 *See* Charles Leadbetter, *Taking a Rich Slice of Silicon Pie*, FIN. TIMES, July 7, 1997, at 57 (stating that Silicon Valley alone is home to about 6000 high-technology companies, with annual sales of approximately $ 200 billion).

n73 *See* STANFORD STUDY, *supra* note 39, at iii ("High technology issuers continue to be the most frequent target of class action litigation. High technology companies represent 34% of all sued in federal court

© ABA, The Business Lawyer, November, 1998

since the effective date of the Reform Act. That statistic is not materially different from the pre-Reform Act experience.").

n74 *See* Press Release, *Lott Says Senate Will Act On "Uniform Standards" Bill Before Easter* (Jan. 28, 1998) ("The high technology industry is the nation's largest creator of jobs--the engine that is driving America's economic expansion. . . . In 1995 Congress passed securities litigation reform to ensure that high-tech companies continue their phenomenal growth and to end abusive litigation. This bill will finish the job.") (on file with *The Business Lawyer*, University of Maryland School of Law); *October 29 Hearing, supra* note 14, at 14-15 ("Class actions have had a considerable impact on Silicon Valley, which I . . . represent. High technology companies account for 34 percent of all the securities issuers sued last year. . . . It's ironic that the very companies that have contributed disproportionately to the economic health of our nation and have been a great source of wealth for investors are the very ones being harassed. They are being penalized for success.") (statement of Rep. Anna Eshoo).

n75 Mirkin v. Wasserman, 858 P.2d 568, 579-80 (Cal. 1993) (noting in dicta that the California blue sky provision does not require proof of reliance).

Although Congress did not discuss this issue during the Uniform Standards Act hearings, it is questionable whether nationwide class actions for securities fraud may be brought under California state law. Federal constitutional law may limit California's ability to entertain national class actions. n76 Apart from constitutional limits, judicial interpretations may limit the reach of the California statute most frequently invoked in securities fraud class actions. Although enacted in 1968, n77 few cases interpret the California blue sky laws. Pending California Supreme Court cases n78 will soon clarify whether California state courts would have remained as an alternative fora for securities class actions. The California blue sky provision most frequently relied upon has been section 25400(d) of the California Corporations Code. n79 Out of 44 securities class action complaints filed in California state courts during 1996 and 1997, 41 (93%) allege claims under section 25400(d). n80

n76 In order for California to apply its laws to non-residents, California must satisfy both the Due Process Clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Article IV. The U.S. Supreme Court has held that to satisfy these provisions in a class action context, the forum state "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821-22 (1985) (citing Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13 (1981)). California courts have interpreted this requirement fairly liberally, requiring only a significant contact that "appl[ies] generally to every class member's claims," without requiring a showing that there are individual contacts to each class member. *In re* Computer Memories Sec. Litig., 111 F.R.D. 675, 687 (N.D. Cal. 1986); *see also* Walker et al., *supra* note 71, at 682. Nonetheless, *Phillips Petroleum* presents a significant hurdle to the certification of a national class in state court and likely deterred state filings pre-Reform Act. Other reasons for the dearth of pre-Reform Act state court filings are the absence of the fraud-on-the-market presumption of reliance in most states and the potential for greater damages and fees under federal law. Perino, *supra* note 4, at 284-85.

n77 CAL. CORP. CODE §§ 25000-25800 (West 1997).

n78 *See infra* notes 86 & 88.

n79 CAL. CORP. CODE § 25400(d).

n80 *Id.* This provision, unique to California among state securities laws, provides:

It is unlawful for any person, directly or indirectly, in this state: If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to

© ABA, The Business Lawyer, November, 1998

> make, for the purpose of inducing the purchase or sale of such security by others, any statement which was . . . false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable grounds to believe was so false or misleading.

*Id.*

Section 25400(d) raises the specter of a state equivalent to the federal "fraud on the market" presumption, allowing for securities fraud class actions without privity or actual reliance. n81 An interpretation from the California Supreme Court allowing open-market fraud actions would be a substantial departure for state blue sky law, which has traditionally concerned itself with fraud in privity, or near privity, situations. n82 There appear, however, to be at least two major impediments to asserting class action claims in California under this provision: a limitation on the class of persons who may be subject to suit, and a jurisdictional prerequisite. n83 The California Supreme Court has agreed to hear two cases which will likely resolve these ambiguities, and should determine whether a nationwide class action can be brought under California law. n84 These decisions will be important even after the Uniform Standards Act because of the continued viability in state court of individual actions and class actions not subject to preemption.

n81 *See id.*

n82 *See, e.g.*, McFarland v. Memorex Corp., 96 F.R.D. 357, 364 (N.D. Cal. 1982).

n83 *See infra* notes 85-88 and accompanying text.

n84 *See infra* notes 86 & 88.

Section 25400(d) extends liability only to those who are engaged in market activity, i.e., selling or offering securities for sale, or purchasing or offering to purchase securities. n85 In a typical securities class action, the issuer and certain of its officers and directors are sued for statements made by them which affect the secondary market trading price of securities the company has previously issued. Section 25400(d) would seem inapplicable to this scenario unless the issuer is engaged in a securities offering at the time of the alleged misstatement or omission, a relatively unusual occurrence. The California Supreme Court has agreed to review who can be defendants under section 25400(d). n86

n85 *See* CAL. CORP. CODE § 25400(d).

n86 StorMedia, Inc. v. Superior Court of Santa Clara County, No. CV760825 (Cal. July 7, 1997) (petition for review).

Section 25400(d) also contains a jurisdictional prerequisite that may preclude nationwide class actions. The section mandates that the defendant's offer or sale take place "in this state." n87 Whether the "in this state" clause prohibits redress under the California blue sky laws for non-residents should be answered by the California Supreme Court sometime this year. n88

n87 *See* CAL. CORP. CODE § 25400(d).

n88 Pass v. Diamond Multimedia Sys., Inc., No. H016376, at 2 (Cal. Jan. 27, 1997) (petition for review).

Congress, however, did not wait for judicial developments. A powerful constituency demanded that Congress protect it from the law of one state because it believed that it could not secure protection from the more obvious source--Sacramento. n89 If Congress had waited just a few months before passing the Uniform Standards Act, the California Supreme Court might have eliminated the need for the statute by ending the migration of securities class actions to state

© ABA, The Business Lawyer, November, 1998

court, at least in California. Thus, the authors question whether the "migration" to state court was more than just a temporary sojourn.

n89 *October 29 Hearing, supra* note 14, at 20 (statement of Robert Hinkley).

A more substantial justification for preemption builds upon principles underlying the passage of the National Securities Markets Improvement Act of 1996 (NSMIA). n90 NSMIA preempted most state regulation governing the offering of securities by issuers whose securities are nationally traded. Some proponents of the Uniform Standards Act believe that preemption of state anti-fraud class actions is a logical extension of NSMIA. n91 In their view, securities trading on national markets--such as the New York Stock Exchange (NYSE), the American Stock Exchange (AMEX), and the National Association of Securities Dealers Automated Quotation System/National Market System (NASDAQ)--should be governed by a uniform national fraud standard. n92 Accordingly, fraud standards should not be subject to the geographical happenstance of where a corporation is headquartered or incorporated or where a purchaser of securities lives. A single uniform standard protects corporations from being exposed to disparate standards in state courts when the companies have turned to the national capital markets for financing. This uniform standard justification does not turn on whether the migration was a lasting phenomenon or not. Interest group pressures, however, feed off of tangible phenomena, not theories. Although uniformity may offer a theory justifying preemption, the migration to California state court provided the hard evidence. Thus, while Kansas is generally credited with beginning state blue sky laws, n93 California may be credited with their demise.

n90 Pub. L. No. 104-290, 110 Stat. 3416 (1996) (codified as amended in scattered sections of 15 U.S.C.).

n91 *See, e.g.*, Perino, *supra* note 4, at 321 (arguing that nationally traded securities should be governed by a uniform set of federal standards).

n92 *Id.* at 324-25.

n93 THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION 367 (2d ed. 1990) (noting that Kansas adopted the first blue sky law in 1911).

### *THE UNIFORM STANDARDS ACT*

The Uniform Standards Act differs substantially from the bills originally introduced in Congress to preempt state securities class actions. A review of the legislative history from introduction to adoption provides important insights into the choices made by Congress and the purposes animating the statute as enacted.

#### *LEGISLATIVE HISTORY AND ANALYSIS*

The path leading to the enactment of the Uniform Standards Act began with the introduction of two bills in the House of Representatives and one in the Senate. The original bills were House Bill 1653, n94 House Bill 1689, n95 and Senate Bill 1260. n96 House Bill 1653, which would have preempted *all* private state anti-fraud actions, quickly fell by the wayside. This left House Bill 1689 and Senate Bill 1260, which only preempted *class* actions, to work their way through Congress. n97

n94 H.R. 1653, 105th Cong. (1997).

n95 H.R. 1689, 105th Cong. (1998).

n96 S. 1260, 105th Cong. (1998).

© ABA, The Business Lawyer, November, 1998

n97 The bills and the Uniform Standards Act explicitly do not preempt enforcement actions brought by state regulators.

House Bill 1689 and Senate Bill 1260 shared a number of features. Both bills preempted all class actions under state law whether brought in state or federal court. Preemption reaches any suit:

> based upon the statutory or common law of any State or subdivision thereof . . . by any private party alleging--(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security. n98

Thus, while the language is not identical, both bills provided for essentially the same broad reach as the general federal anti-fraud proscription found in Rule 10b-5 under the Exchange Act. n99 The scope of preemption, however, is limited to "class actions."

n98 *See* H.R. 1689 § 2(a)(1) (proposing to add Securities Act § 16(b)); S. 1260 § 101(a)(1) (same).

n99 *See* 17 C.F.R. § 240.10b-5 (1998).

### Preemption of "Class Actions"

Early versions of both House Bill 1689 and Senate Bill 1260 relied on a unique definition of "class action" that does not mirror the definition found in Rule 23 of the Federal Rules of Civil Procedure (Rule 23) (which has been followed by most state civil procedure codes). n100 Both bills contained multiple, overlapping definitions, suggesting that Congress was concerned that enterprising plaintiffs' lawyers would find a way to evade preemption. The original bills defined "class action" as follows:

> Any single lawsuit, or any group of lawsuits filed in or pending in the same court involving common questions of law or fact, in which--(A) damages are sought on behalf of more than 25 persons; (B) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated; or (C) one or more of the parties seeking to recover damages did not personally authorize the filing of the lawsuit. n101

Unlike Rule 23, the bills' definition offers judges very little discretion in the class action determination--questions of numerosity and adequacy are eliminated, leaving the judge to decide only whether there are common questions of law or fact. The motivation for this bright line definition of class action was the drafters' belief that it would afford issuers greater certainty.

n100 H.R. 1689 § 2(a)(1) (proposing to create Securities Act § 16(f)(2)); S. 1260 § 101(a)(1) (same).

n101 *See* H.R. 1689 § 2(a)(1) (May 21, 1997) (proposing to add Securities Act § 16(d)(1)); S. 1260 (Oct. 7, 1997) (same).

The definition was substantially revised by the time it was enacted. The Uniform Standards Act uses the term "covered class action" and defines it as follows:

> (i) any single lawsuit in which--(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or (II) one or more named

parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or (ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which--(I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose. n102

n102 Securities Act § 16(f)(2)(A) (to be codified at 15 U.S.C. § 77p(f)(2)(A)).

The twenty-five person threshold was raised at the request of the SEC. n103 The Commission was concerned about situations--not infrequent--in which a broker or investment adviser defrauds a client base of more than twenty-five. n104 Preempting state law in this situation would eliminate a number of important rights and remedies--including agency law duties and punitive damages--necessary and appropriate in the context of a face-to-face transaction between a broker or adviser and her client. The number chosen--fifty--is somewhat arbitrary and remains well below the ordinary numerosity requirements for class actions. n105 It will be interesting to see if the fifty person threshold influences judges in the future in making numerosity determinations in class actions, or whether the definition will be limited to the Uniform Standards Act. The appearance in the final bill of the word "covered" as a modifier to "class action" would appear to indicate that Congress does not intend for the definition to be applied in other areas. The increase to fifty makes the definition less intrusive on what is predominantly a state law concern--face-to-face transactions within one state.

n103 *See Hearing Concerning H.R. 1689, The "Securities Litigation Uniform Standards Act of 1997," Before the Subcomm. on Fin. and Hazardous Materials of the House Comm. on Commerce*, 105th Cong. 9 (May 19, 1998) (testimony of Arthur Levitt, Chairman, SEC) [hereinafter *May 19 Levitt Testimony*].

n104 *Id.* at 4 ("Regulated persons, such as brokers, dealers, and investment advisers, who perpetrate frauds on their clients should remain subject to suit in state court where stricter sanctions may be available. These frauds, including Ponzi schemes and pyramid transactions, may be perpetrated on multiple clients. A 25 person threshold is too low and may force many of these types of cases into federal court.").

n105 *See, e.g.*, Zimmerman v. Thomson McKinnon Sec., Inc. [1989-1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) P94,733, at 93,961 (S.D.N.Y. Oct. 11, 1989) (refusing to certify a class of 120 plaintiffs on numerosity grounds); Stoudt v. E.F. Hutton & Co., 121 F.R.D. 36, 38 (S.D.N.Y. 1988) (234 plaintiffs); Steinmetz v. Bache & Co., 71 F.R.D. 202, 204 n.3 (S.D.N.Y. 1976) (185 plaintiffs).

The common questions of law or fact clause was also fine-tuned. It originally omitted any mention of predominance (required for a class action under Federal Rule Civil Procedure 23(b)(3)). n106 The revised clause preempts cases where "questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members. . . ." n107 The SEC was concerned that without a predominance requirement it would be too easy to sweep together separately filed actions involving a single common question of law or fact. n108 For example, under the original definition defendants would have been able to group a contract action and a fraud action if there were any common question between them. The predominance requirement eliminates this possibility. The predominance requirement does not include, however, common questions of reliance. Requiring a common question of reliance would mean that the Uniform Standards Act would preempt very little because the fraud-on-the-market presumption is generally not available in state court actions. Many courts have held that individualized questions of reliance necessarily outweigh common questions in state-law fraud actions, making it difficult to certify a class action. n109

n106 Most, if not all, securities class actions are brought pursuant to that rule. *See* FED. R. CIV. P. 23(b)(3); *see also* 7B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1781 (1986) (Rule 23(b)(3) is "used quite frequently in cases involving securities frauds.").

© ABA, The Business Lawyer, November, 1998

n107 Securities Act § 16(f)(2)(A)(i)(II) (to be codified at 15 U.S.C. § 77p(f)(2)(A)(i)(II)).

n108 *See May 19 Levitt Testimony, supra* note 103, at 4.

n109 *See, e.g.,* Katz v. Comdisco, Inc., 117 F.R.D. 403, 412 (N.D. Ill. 1987). Because proof of actual reliance is necessary, "common law claims . . . do not lend themselves to class action treatment." *Id.*

Note also that the original bills applied to any "single lawsuit or group of lawsuits." n110 The version finally adopted in the Uniform Standards Act omits "group of lawsuits" in this portion of the definition. The grouping provision is now found in a separate subsection. n111 There is no requirement that common questions predominate in these individual cases, but in order for the provision to apply, the judge must first combine the actions in some fashion. An action filed in state court will be preempted only if forty-nine others are filed in the same state court and combined. This grouping provision was added out of fear that the plaintiffs' bar would disaggregate a class action by filing multiple, identical individual actions in state court (similar to "mass actions" filed by the plaintiffs bar in mass tort cases). n112 The threat of disaggregation of a class action into multiple lawsuits was probably remote. Unlike a mass tort in which each individual suffers significant bodily injuries and probably has a sufficient claim to make disaggregation profitable, n113 individual claims are typically small in securities fraud.

n110 *See* H.R. 1689, 105th Cong. § 2 (proposing to create Securities Act § 16(f)(3)); S. 1260, 105th Cong. § 101(a)(1) (same).

n111 Securities Act § 16(f)(2)(A)(ii) (to be codified at 15 U.S.C. § 77p(f)(2)(A)(ii)).

n112 Statement of Managers, *supra* note 3.

n113 *See* Michael A. Perino, *Class Action Chaos? The Theory of the Core and an Analysis of Opt-Out Right in Mass Tort Class Actions,* 46 EMORY L.J. 85 (1997) (arguing that opt-out rights in mass tort actions, such as those involving claims stemming from cigarette smoking or asbestos exposure, can frustrate resolution of the case).

Congress left certain interpretive questions for the courts. For example, what is meant by "same court"? Does it mean courts of the same state, county, or before the same judge? In the authors' view, the only rational answer is the same state, as the assignment of judges is fortuitous, and if the standard were the same county, plaintiffs would be able to easily avoid preemption. Potential problems with the grouping provision also lurk in the background. What is meant by the ambiguous phrase "otherwise proceed as a single action for any purpose"? Does the taking of joint discovery suffice? Standing alone it would seem that the answer should be yes, but this question is complicated by Congress' decision to grant federal judges the power to stay discovery in state securities actions. This stay power is limited, however, as federal judges probably do not have the authority to stay state court discovery if a federal action has not yet been filed. n114 This limitation counsels in favor of grouping cases that have been consolidated for purposes of discovery.

n114 *See infra* text accompanying notes 160-64.

An additional subsection of the definition of "class action," which preempts cases where damages are sought by "one or more named parties . . . on behalf of themselves and other unnamed parties similarly situated," made it from the original bills into the Uniform Standards Act largely untouched. n115 The sole exception is the inclusion of language requiring that common questions predominate. In what appears to be a drafting oversight, this subsection does not except consideration of individual issues of reliance as subsection (I) does. n116 To avoid unnecessary litigation, Congress should draft a technical correction. This subsection is likely to have greater impact than subsection (I) because it is impossible to know at the time of filing how many members there might be in the plaintiff class. That number will depend on opt-outs from the class action, an unknown variable at the time of filing.

n115 Securities Act § 16(f)(2)(A)(i)(II) (to be codified at 15 U.S.C. § 77p(f)(2)(A)(i)(II)).

© ABA, The Business Lawyer, November, 1998

n116 *Id.*

A provision in the original bills, defining as a class action a suit in which "one or more of the parties seeking to recover damages did not personally authorize the filing of the lawsuit," n117 was omitted from the Uniform Standards Act at the urging of the SEC. n118 That provision was problematic because it covers nothing intended to be preempted that is not already covered by the other definitions, but it inadvertently would have preempted suits by guardians on behalf of minors, trustees on behalf of trust beneficiaries, and other representative relationships in which there was no record of abuse.

n117 *See* H.R. 1689, 105th Cong. § 2 (proposing to create Securities Act § 16(d)(1)(C)).

n118 *See May 19 Levitt Testimony, supra* note 103, at 4.

A provision was added to clarify the scope of the class action definition: "a corporation, investment company, pension plan, partnership, or other entity shall be treated as one person or prospective class member" so long as the entity was "not established for the purpose of participating in the action." n119

n119 Securities Act § 16(f)(2)(C) (to be codified at 15 U.S.C. § 77p(f)(2)(C)).

### *Limitation to Nationally Traded Securities*

The preemption of the Uniform Standards Act is limited in another important way--it reaches only "covered securities." n120 This definition relies on provisions added to the Securities Act by NSMIA. Section 18(b)(1) of the Securities Act preempts state registration for "nationally traded securities," defined as securities "listed, or authorized for listing, on the [NYSE], or the [AMEX], or listed on the [NASDAQ]" or "a security of the same issuer that is equal in seniority or that is a senior security" of the same issuer who has a security listed on the NYSE, AMEX or NASDAQ. n121 The Uniform Standards Act adds preemption of state anti-fraud class actions to NSMIA's preemption of state registration requirements. n122 If the issuer has any securities listed on a national trading market, all of its securities equal or senior to that listed security are exempt from state anti-fraud class actions. This captures debt within the scope of preemption. n123 For example, if a company has its stock listed for trading on the NYSE, its unlisted debt would also be exempt. Issuers whose securities are not listed on national markets, however,--primarily micro-cap and penny stock issuers-- remain subject to state actions. n124

n120 *Id.* § 16(f)(3) (to be codified at 15 U.S.C. § 77p(f)(3)).

n121 15 U.S.C. § 77r(a) (Supp. II 1996). The provision also allows the SEC to add other exchanges to this list by rule.

n122 Exchange Act § 28(f)(2) (to be codified at 15 U.S.C. § 78bb(f)(2)).

n123 *But see infra* notes 129-33 and accompany text (discussing exclusion for debt issued in private placements).

n124 *See October 29 Hearing, supra* note 14.

An early version of House Bill 1689 would have preempted all securities class actions against an issuer if it had *any* covered securities. n125 The Uniform Standards Act adopts the Senate's narrower approach, preempting only those actions involving listed or senior securities. n126 The Senate version also included securities of investment companies as a covered security. n127 The House version's failure to cover investment companies created an anomaly, as closed-end mutual funds are covered because they are traded over exchanges, while open-end mutual funds were left subject to state class actions. This anomaly was eliminated by the Conference Committee, n128 thus eliminating potential worry for investment companies.

© ABA, The Business Lawyer, November, 1998

n125 H.R. 1689, 105th Cong. § 2 (proposing to create Securities Act § 16 (d)(2)).

n126 Securities Act § 16(f)(3) (to be codified at 15 U.S.C. § 77p(f)(3)).

n127 S. 1260, 105th Cong. (1998).

n128 Securities Act § 16(f)(3) (to be codified at 15 U.S.C. § 77p(f)(3)).

In response to a criticism by Professor John Coffee that the covered security definition was potentially overbroad, n129 the Uniform Standards Act also excludes debt securities issued in a private placement from the definition. Professor Coffee pointed out that these securities issuances are governed by private placement agreements containing numerous warranties and covenants, the breach of which gives rise to a contract claim. n130 The definition is curiously phrased, however, in that it excludes only debt securities "exempt from registration under this title pursuant to rules issued by the Commission under section 4(2)" of the Securities Act. n131 By its terms the definition would not apply to debt securities relying on a private placement exemption directly under section 4(2). Therefore, only issuers relying on Rule 506 under Regulation D would be excluded. n132 The same approach is taken in NSMIA. n133

n129 *Hearing on H.R. 1689 Before the Subcomm. on Fin. and Hazardous Materials of the House Commerce Comm.*, 105th Cong. (1998) (statement of Professor John Coffee, Columbia Law School).

n130 *Id.*

n131 Securities Act § 16(f)(3) (to be codified at 15 U.S.C. § 77p(f)(3)).

n132 17 C.F.R. § 230.506 (1998).

n133 Pub. L. No. 104-290, 110 Stat. 3417 (1996).

A related carve-out further limits the preemptive reach of the Uniform Standards Act. In response to another concern raised by Professor Coffee, the Uniform Standards Act excludes from its reach any class action "that seeks to enforce a contractual agreement between an issuer and an indenture trustee" if brought by "a party to the agreement or a successor to such party." n134 Such claims sound more in contract than in fraud, even if misstatements are alleged, and state courts are the appropriate forum for these contractual claims.

n134 Exchange Act § 28(f)(3)(C) (to be codified at 15 U.S.C. § 78bb(f)(3)(C)).

### The Delaware Carve-Out

Another change to the bills in response to concerns of the SEC and others was the so-called "Delaware carve-out." n135 The original bills would have had the unintended effect of preempting a substantial body of state corporate law. The distinction between state corporate law and federal securities law has been zealously guarded by the U.S. Supreme Court n136 and generally respected by Congress and the SEC. The overall definition of class action was revised to explicitly exclude "an exclusively derivative action brought by 1 or more shareholders on behalf of a corporation." n137 Derivative actions, of course, are the primary enforcement vehicle available for most corporate law duties, traditionally the province of state courts.

n135 Securities Act § 16(d)(1) (to be codified at 15 U.S.C. § 77p(d)(1)).

n136 *See* Santa Fe Indus., Inc. v. Green, 430 U.S. 462 (1977).

n137 Securities Act § 16(f)(2)(B) (to be codified at 15 U.S.C. § 77p(f)(2)(B)).

Other corporate law duties, however, required a more carefully tailored carve-out. Under state corporate law, issuers and their officers and directors generally owe a duty of disclosure to their shareholders as one element of their fiduciary duties. n138 That duty of disclosure requires the issuer and its managers to speak truthfully when soliciting action by shareholders. n139 Even though the corporate law duty of disclosure significantly overlaps with the coverage of federal securities law, actions based on corporate duty of disclosure were not considered to be part of the problem that the Uniform Standards Act was intended to address. Claims based on the breach of this duty typically arise out of mergers, tender offers, and other extraordinary corporate transactions. These claims are either individual, rather than derivative, or both because they involve the voting rights of shareholders or other rights of the individual, even though they may have an effect on the corporation as a whole. These claims are routinely litigated in state courts, most notably the Delaware Court of Chancery (Chancery Court). The Chancery Court, with its steady diet of corporate claims, has developed expertise in this area that the federal courts are unlikely to match. In addition, the Delaware courts can resolve these claims within days rather than months, an important consideration if a merger is pending.

n138 *See generally* Lawrence Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 VAND. L. REV. 1087 (1996). Professor Hamermesh assisted in the drafting of the Delaware carve-out.

n139 *Id.* at 1105.

In order to preserve these advantages of state law, a provision was drafted by an ad hoc committee led by then-SEC General Counsel Richard H. Walker and consisting of certain members of the American Bar Association's Task Force on Securities Reform and the Delaware bar, as well as academics and SEC staff. n140 This effort had widespread support, including that of corporate issuers, who were interested in maintaining the predictability offered by Delaware corporate law. n141 The preliminary approach taken was to limit the scope of preemption to transactions effected over national markets. This approach would have excluded mergers, stock buybacks, and tender offers, as these transactions are typically completed through the force of state law or an escrow agent. Such an approach also would have excluded most public offerings, however, which proponents deemed essential to preemption. Accordingly, a carve-out from the general scope of preemption was adopted instead.

n140 *See* Rachel Witmer, *Special Report: SEC, Private Bar Working to Address Flaw in Litigation Reform Bills*, 30 Sec. Reg. & L. Rep. (BNA) 169 (Jan. 30, 1998).

n141 *Id.*

The carve-out contains two prongs. Subsection (A) preserves state jurisdiction for breach of fiduciary duty claims arising from transactions taking place between the issuer and its security holders. n142 These include: (i) repurchases of securities by the issuer from its security holders, i.e., "buybacks"; (ii) reorganizations, such as the exchange by the issuer of one class of securities for another; and (iii) offerings of additional securities solely to existing shareholders, i.e., "rights offerings." Subsection (B) preserves state jurisdiction for breach of fiduciary duty claims arising from an issuer's recommendation, position, or other communication concerning three other types of corporate transactions: (i) mergers and other corporate transactions requiring shareholder approval; (ii) tender offers; and (iii) situations where majority shareholders force minority shareholders to relinquish their shares, i.e., "freeze-outs." Both prongs extend to misstatements made by affiliates, so issuers cannot insulate themselves from liability by directing misleading disclosure through its parent, subsidiary, controlling shareholder, or an underwriter.

n142 *Id.*

Both provisions are limited to actions "based upon the statutory or common law of the State in which the issuer is incorporated . . . or organized." n143 This limitation gives the issuer control over its litigation exposure because of its ability to choose its state of incorporation. The Senate legislative history suggests plaintiffs are expected to file these cases in the defendant's state of incorporation n144 and the Conference Committee Report repeats the suggestion. n145 Limiting claims against Delaware corporations to the Chancery Court would help maintain the uniformity and predictability of Delaware corporate law. The legislative history does not explain, however, what would happen if the plaintiff

© ABA, The Business Lawyer, November, 1998

wanted to file its state claim pendent to a federal claim in federal court. n146 Could those claims only be filed in a federal court sitting in the issuer's state of incorporation? Such a conclusion would be simultaneously costly for distant plaintiffs and lucrative for Delaware local counsel, but the text of the provision does not support this jurisdiction-stripping interpretation. The legislative history sweeps too broadly--the Uniform Standards Act does not prevent plaintiffs from maintaining pendent claims in any federal court that has venue.

   n143 *Id.*

   n144 Statement of Managers, *supra* note 3, at n.2 ("The Committee expressly does not intend for suits excepted under this provision to be brought in venues other than in the issuer's state of incorporation, in the case of a corporation, or state of organization, in the case of any other entity.").

   n145 H.R.CONF. REP. NO. 105-803, at 2 n.2 ("It is the intention of the managers that the suits under this exception be limited to the state in which issuer [sic] of the security is incorporated in the case of a corporation, or state of organization, in the case of any other entity.").

   n146 Federal courts have exclusive jurisdiction over claims brought under the Exchange Act and the Williams Act. *See* 15 U.S.C. § 78aa (1994).

   The Delaware carve-out, while clearly necessary to preserve state corporate law, creates at least one unavoidable problem: it re-opens the "reverse auction" problem for class action settlements. The "reverse auction" problem was created by the U.S. Supreme Court's decision in *Matsushita Electric Industrial Co. v. Epstein*. n147 In that case, the U.S. Supreme Court held that a state court class action settlement, which released both state law claims and federal securities claims pending in a parallel federal suit, had a preclusive effect on the federal claims. n148 The state court judgment precluded the federal claims notwithstanding the federal court's exclusive jurisdiction over the federal securities claims. n149

   n147 516 U.S. 367 (1996).

   n148 *Id.* at 374.

   n149 *See* 15 U.S.C. § 78aa.

   *Matsushita* raises the possibility that defendants will be able to minimize their liability exposure through a "reverse auction," offering to settle claims against them with the plaintiffs' lawyer who offers the *lowest* bid. n150 This result obviously threatens the interests of the plaintiff class, which could have its claims sold out on the cheap. On remand in *Matsushita*, the Ninth Circuit found that the plaintiffs' lawyers in the state case had in fact settled the federal claims for less than they were worth. n151 This inadequate representation meant that the state court judgment was not entitled to preclusive effect. n152

   n150 *See generally* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1370-72 (1995).

   n151 Epstein v. MCA, Inc., 126 F.3d 1235, 1250 (9th Cir. 1997).

   n152 *Id.* at 1250-54.

   The Uniform Standards Act reduces the potential for a "reverse auction." By eliminating parallel state securities class actions, the Uniform Standards Act lessens the chances for a collusive settlement between defendants and a faithless plaintiffs' lawyer. The Uniform Standards Act does not, however, eliminate this problem entirely. The Delaware carve-out and the exclusion for derivative claims allow some parallel state actions to continue. Federal securities claims

© ABA, The Business Lawyer, November, 1998

can be settled in those state cases, even though they cannot be litigated on the merits in state court because of exclusive federal jurisdiction. Thus, the *Matsushita* reverse auction problem persists in that category of cases. Defendants will still be able to run "reverse auctions" when state cases have been filed, pitting state court plaintiffs against federal court plaintiffs.

### Extension of the Discovery Stay to State Court

The limitation of preemption to class actions creates an obvious loophole in the Reform Act's discovery stay provision. The plaintiffs' lawyers would still be free to bring a federal class action and a parallel state action on behalf of an individual who would otherwise be a member of the class. Discovery obtained in the state individual action could then be used to bolster the complaint in the federal class action.

Sponsors of Senate Bill 1260 and House Bill 1689 initially suggested that they believed preemption of state class actions would end the use of state court for discovery. n153 The issuer community, too, evidently did not believe that the discovery stay loophole presented a substantial concern. Although representatives of this community testified that they were severely burdened by parallel federal and state suits, none pointed out the possible loophole as a problem during the legislative hearings. Rather, their testimony left the impression that they believed the problem would be solved by preempting state class actions. n154 The problem posed by individual actions could be minimized if claims were small enough that defendants could simply pay the damages demanded in the complaints rather than litigating. If this strategy proved ineffective, issuers apparently believed that state court judges would stay discovery in favor of the federal suit given the small number of plaintiffs (necessarily less than fifty under the Uniform Standards Act's grouping provision) in the state court case.

> n153 *October 29 Hearing, supra* note 14, at 18 ("Because of the shift to state courts, the stay of discovery is not in place. This means the threat of huge level costs remains and the incentive to settle meritless cases continues. It is this undermining of the federal law that prompted Representative White and I to introduce this bill.") (statement of Rep. Anna Eshoo).

> n154 *See, e.g., id.* at 51 (discussing the problem of parallel federal and state suits at length, then urging Congress to adopt Senate Bill 1260) (statement of Robert C. Hinkley, Vice President, Xilinx Corp.).

In seeking a more effective solution to the discovery stay problem, a conundrum arises. The obvious solution would be to preempt *all* securities actions, not just class actions. This was the approach taken by House Bill 1653. n155 Preempting all state securities actions, however, comes at an unacceptable cost. As the Commission made clear in its Senate testimony, state law provides individuals important protections in investors' relationships with their brokers and advisers, including the availability of punitive damages in cases of egregious fraud. n156 In addition, preemption of individual actions would pose an even greater threat to principles of federalism. Investors defrauded in local transactions would be precluded from suing in state court under state law, even though the state interest would likely outweigh the federal interest in such cases. n157 Moreover, forcing all actions, rather than just class actions, to be brought in federal court would exacerbate the problem of overly crowded federal dockets. n158 In any event, preemption of all actions probably would not have stopped circumvention of the federal discovery stay. The plaintiffs would still be left with certain options, including state court derivative actions and state inspection statutes. n159

> n155 H.R. 1653 § 2(b) (1997).

> n156 *October 29 Hearing, supra* note 14, at 17 (statement of SEC).

> n157 *Id.* at 29.

> n158 On January 1, 1998, William H. Rehnquist, Chief Justice of the U.S. Supreme Court released "The 1997 Year-End Report on the Federal Judiciary." Preemption exacerbates the central problem facing federal courts flagged in the report:

Fiscal Year 1997 saw courts of appeals and bankruptcy filings at their highest rates in history. District courts also were very busy. . . . Many factors have produced this upward spiral, including . . . large class-action litigation. . . . Unless steps are taken to stop or reverse this trend, either the demands placed on the federal judiciary will eventually outstrip its resources, or the judiciary will become so large that it will lose its traditional character as a distinctive judicial forum of limited jurisdiction.

William H. Rehnquist, The 1997 Year-End Report on the Federal Judiciary 4 (Jan. 1, 1998) (on file with *The Business Lawyer*, University of Maryland School of Law); *see also* Brigid McMenamin, *Un-Natural Justice*, FORBES, May 5, 1997, at 122 ("Federal judges are swamped, right now facing, on average, 416 civil cases *each*, nearly 23% more than in 1990. Last year the number of suits filed in federal courts was up 8%, from 248,335 in 1995 to 269,132 in 1996. . . . Overwhelmed, the judiciary is begging Congress for 55 new judges."). The authors do not mean to suggest that the Uniform Standards Act will cause an increase in federal cases of dramatic proportions. Preemption, however, clearly will result in the addition of at least some complex securities class actions to federal dockets. Preempting individual actions as well would have multiplied the problem exponentially.

n159 Inspection statutes under state corporate law may give shareholders an effective discovery tool for securities fraud class actions:

Shareholders seeking to uncover suspected wrongdoing by corporate management have a statutory right under Delaware's corporate inspection statute to examine the company's "books and records." At a minimum, the "books and records" of a corporation include: corporate accounting records; minutes of all meetings of the shareholders, board of directors, and board committees; records of actions taken by written consent of the shareholders or board of directors; stocklist materials; the corporation's certificate of incorporation; corporate bylaws; written communications to shareholders; and copies of resolutions creating one or more classes of stock. "Book and records" may also include documents relating to allegedly wrongful transactions.

Randall S. Thomas and Kenneth J. Martin, *Using State Inspection Statutes for Discovery in Federal Securities Fraud Actions*, 77 B.U. L. REV. 69, 84 (1997) (footnotes omitted).

Congress found a less objectionable solution to this problem. House Bill 1689 was amended to include the following provision designed to eliminate the use of state court actions as a vehicle for discovery for use in federal actions:

Circumvention of stay of discovery. --Upon a proper showing, a court may stay discovery proceedings in any private action in a State court as necessary in aid of its jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this section. n160

This provision was incorporated into the Uniform Standards Act. n161

n160 H.R. 1689, 105th Cong. § 101(a)(2) (1998) (proposing to create Securities Act § 27(b)(4)).

n161 Securities Act § 27(b)(4) (to be codified at 15 U.S.C. § 77v(b)(4)).

As written, the stay gives federal judges broad discretion in staying state discovery. Appellate judges will find it necessary to provide some guidelines for the use of the stay in order to avoid unwarranted intrusion into state proceedings. The language "as necessary in aid of its jurisdiction, or to protect or effectuate its judgments" tracks that found in the Anti-Injunction Act. n162 Courts are likely to look there for guidance. If they do, they should be unlikely to enjoin state discovery based on an anticipated but unfiled federal action. n163 The language of the provision reinforces the

© ABA, The Business Lawyer, November, 1998

conclusion, as it is limited to "an action subject to a stay of discovery," which suggests that a federal action must already be filed.

> n162 *See* 28 U.S.C. § 2283 (1994).

> n163 *See* Carlough v. Amchem Prods., Inc., 10 F.3d 189, 201 (3d Cir. 1993) (holding that "district court was obliged to ascertain, at least in a preliminary fashion, its own subject matter jurisdiction . . . before issuing an injunction in aid of that jurisdiction").

If the provision does not apply to cases in which a federal action has not yet been filed, it may not completely close the discovery stay loophole. The plaintiffs may seek to avoid the provision by filing the state action first, making discovery demands, and then filing the federal action within 364 days after the state filing. This strategy, however, may be difficult to implement. The plaintiffs' lawyers who file only in state court may find themselves displaced as lead counsel in the subsequent federal action if a rival plaintiffs' lawyer brings a federal action first.

The vagueness of a "proper showing" raises a number of questions about the interpretation of this new discovery stay provision. When should a federal judge stay discovery? Is a "proper showing" made when the same law firm appears for the plaintiffs in both the state and federal case? It would seem that a stay would be required in these circumstances to protect the stay in federal court. Should the federal judge stay state discovery when the complaints are based on the same or similar allegations, but the lawyers are different? Under these circumstances, the authors believe that a stay would be justified unless the lawyer in the state case signed an affidavit promising not to share discovery with the lawyer in the federal case. n164 Will simply having the same defendants in both suits suffice to justify a stay? Probably not, absent some showing of a relationship between the state and federal plaintiffs or their lawyers. The defendants might be justified, however, in moving for a protective order barring disclosure of the discovery in the state case. If the state court refused the protective order, the federal judge would then be justified in issuing a stay. Does the size of the state plaintiff's loss matter? A small amount of damages sought relative to the expense of the lawsuit suggests that the suit may have been brought primarily to seek discovery.

> n164 *See supra* note 63 and accompanying text. *Cf.* Sperry Rand Corp. v. Rothlein, 288 F.2d 245, 248 (2d Cir. 1961) (holding that a federal court can enjoin the use of federal discovery in a state case).

Another question arises from the carve-outs in the Uniform Standards Act. Is it ever appropriate to stay discovery in a state court derivative action or a direct action brought under the Delaware carve-out? Staying discovery would frustrate the purpose of those carve-outs. Finally, there are timing questions. What happens when a federal judge, who previously stayed state court discovery, grants a motion to dismiss the federal complaint with leave to amend? Does discovery then proceed in the state action which can be used in amending the federal complaint? Allowing discovery, particularly when the federal complaint has already been determined to be inadequate, would appear to undermine the purpose of the stay. On the other hand, if the federal action has been dismissed without leave to amend, there seems to be no rational basis for postponing discovery in the state proceeding, and there would no longer be the requisite "action subject to a stay of discovery."

### State Government and Pension Plan Carve-Out

State governmental authorities were generally opposed to the Uniform Standards Act. n165 Nonetheless, a separate carve-out benefitting state governments and pension funds came as a surprise, as the hearings were silent on the need for such an exception. Senator Paul Sarbanes offered this provision as a floor amendment. The amendment provides:

> Notwithstanding any other provision of this section, nothing in this section may be construed to preclude a State or political subdivision thereof or a State pension plan from bringing an action involving a covered security on its own behalf, or as a member of a class comprised solely of other States, political subdivisions, or State pension plans that are named plaintiffs, and that have authorized participation, in such action. n166

© ABA, The Business Lawyer, November, 1998

n165 *See* News Release, New York State and Local Finance Officials Ask Senator D'Amato to Oppose Securities Law Preemption Efforts (Oct. 6, 1997) (announcing that 104 state and local public finance officials from New York signed a letter of opposition) (on file with *The Business Lawyer*, University of Maryland School of Law).

n166 Securities Act § 16(d)(2)(A) (to be codified at 15 U.S.C. § 77p(d)(2)(A)).

The practical effect of the amendment is that it will save actions by state entities from being preempted as class actions under the grouping provision. Even without this amendment, state entities were free to sue in state court where they would only count as one investor for purposes of the preemption threshold. With the amendment, state entities may not be grouped with any other plaintiff (state entity or not) for purposes of counting to fifty. n167 The primary situation in which saving state-entity class actions from preemption is likely to apply is when a state allows certain political subdivisions such as school districts, counties, or cities to invest in pools created by larger political subdivisions. If the central fund is defrauded, these smaller jurisdictions may band together to sue as a class not subject to preemption. The policy basis for the Sarbanes amendment is that state taxpayers may be required to make up losses that these entities cannot cover. n168 In practice, the amendment is unlikely to be invoked with any frequency as most state entities will find it cheaper to participate in a broader-based federal class action. Only when state law confers substantial advantages will it make sense for state entities to opt for their own class action.

n167 *See id.*

n168 *See Federal Securities Preemption*, NATION'S CITIES WEEKLY, May 18, 1998, at 3-4. ("If defrauded state or local pension funds were barred from recovering from corporate wrong-doers in state court . . . the state or city and its taxpayers may be stuck with making up losses in the fund. Not only would this jeopardize general revenue, leading to a likely loss of jobs and services to the public, but it could also severely damage a jurisdiction's credit rating.").

Despite the Sarbanes amendment's limited practical effect, it generated considerable opposition in the House. Critics of the amendment argued that the provision would give plaintiffs' lawyers a new line of business representing classes of state pension plans, thus creating a new class of professional plaintiffs from the ranks of state government. n169 Recent allegations that plaintiffs' lawyers were making campaign contributions in exchange for being selected as class counsel by state pension plans lends credibility to this criticism. n170 Moreover, the critics alleged that the amendment would undermine the effect of the lead plaintiff provision by encouraging state entities to proceed in state court. n171 In the end, however, these criticisms failed to carry the day and the House acquiesced in the measure, but only after adding a provision requiring that the state entities affirmatively opt-in to the class. n172 This provison should limit the ability of plaintiffs' lawyers to assemble classes of compliant pension funds.

n169 *Securities Litigation Uniform Standards Act: Hearing on H.R. 1689 Before the Subcomm. on Finance and Hazardous Materials of the House Comm. on Commerce*, 105th Cong. 9 (1998) ("I also am concerned that a clever plaintiff's lawyer may use this exception to vitiate the core protective measures established in the PSLRA. . . .") (statement of John F. Olson) [hereinafter *Olson Testimony*].

n170 *See* Diana B. Henriques, *A Legal-Fee Firecracker in the Cendant Case*, N.Y. TIMES, July 14, 1998, at D1 (noting that counsel for the New York State Common Retirement Fund which is seeking lead plaintiff status in the Cendant Corporation class actions had previously contributed in excess of $ 40,000 to the campaign of the New York State Comptroller).

n171 *See Olson Testimony, supra* note 169, at 9.

n172 H.R. 1689, 105th Cong. § 101(a) (proposing to create Securities Act § 16(c)).

**Removal Provision**

© ABA, The Business Lawyer, November, 1998

The Uniform Standards Act allows the defendant to remove covered class actions to federal court. "Any covered class action brought in any State court involving a covered security, as set forth in subsection (b), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to subsection (b)." n173

n173 Securities Act § 16(c) (to be codified at 15 U.S.C. § 77p(c)).

The provision is unusual in that it allows actions to be removed to federal court even though they are preempted by the Uniform Standards Act. That is, it allows for removal of actions so that they can be dismissed in federal court. Ordinarily, one would expect the law to require the defendant to bring its motion to dismiss or demurrer in state court. Indeed, the Uniform Standards Act appears to strip the state court of subject matter jurisdiction and thus, the state court should dismiss the case on its own motion. The removal provision, however, not only allows federal courts to interpret the scope of preemption, it also brings in the Reform Act's stay of discovery. n174 Some state court rules would allow discovery while a motion to dismiss was pending, thus forcing the defendant to seek a discretionary stay from the state court, or an injunction against discovery from a federal court under the Uniform Standards Act's stay provision. Removal allows the defendant to remove the action to federal court and file a motion to dismiss based on the Uniform Standards Act. The motion to dismiss automatically triggers the federal discovery stay under the Reform Act. If a non-preempted action has been erroneously removed to federal court, subsection (d)(4) allows the federal court to remand the action to state court. n175

n174 See 15 U.S.C. § 78u-4(b)(3)(B).

n175 Securities Act § 16(d)(4) (to be codified at 15 U.S.C. § 77p(d)(4)). In addition, the House version of the "Delaware carve out" excludes fiduciary duty claims from the removal provision, while the Senate version might have been interpreted to allow for their initial removal to federal court. The Uniform Standards Act adopts the House version, thus leaving state fiduciary duty claims to proceed in state court without the potential delay for removal and remand.

A bill currently working its way through Congress could disrupt that arrangement. House Bill 3789 would allow for removal of class actions, by any defendant or non-representative plaintiff, whenever any member of the plaintiff class was a citizen of a different state than any defendant. In effect, "minimal diversity" would be sufficient to bring any class action into federal court. State substantive law would be applied, but subject to federal procedural rules. This bill, if enacted in its present form, would undo at least part of the compromise reached in the Delaware carve-out. State law would continue to apply, but it would be interpreted exclusively by federal judges. Such an outcome would undermine the predictability of Delaware law, as well as eliminate the efficiency advantages for the resolution of disputes offered by the Delaware Court of Chancery. At a minimum the class action removal bill should be amended to incorporate the Delaware carve-out found in the Uniform Standards Act. Indeed, a broader carve-out would be necessary to preserve fiduciary duty claims not involving the purchase or sale of a security.

### THE NEW NATIONAL STANDARD

The adoption of the Uniform Standards Act has made federal law under the Reform Act the new national standard for most securities fraud class actions. Accordingly, the operation of the Uniform Standards Act is inextricably tied to the effectiveness of the Reform Act. This part of the Article discusses recent developments under the Reform Act and the likely impact of the Uniform Standards Act on some of the Reform Act's key provisions. In assessing the post-Uniform Standards Act national standard, the Article draws upon data gathered by the authors during the last three years while studying private federal and state court litigation on behalf of the SEC.

Two studies analyzed the first year of practice under the Reform Act. n176 Both concluded that it was too soon to judge its effectiveness. n177 This conclusion continues to hold true today. With limited exceptions, none of the Reform Act's key provisions have been interpreted by federal appellate courts. Nonetheless, certain early observations can be made. The Reform Act's heightened pleading standards and stay of discovery have made it more difficult for plaintiffs to file complaints that will withstand a motion to dismiss. n178 Plaintiffs have responded with allegations in complaints that generally appear to be specific to the action and do not follow the cookiecutter mold prevalent before the Reform Act. n179 Notwithstanding this higher pleading bar, the Reform Act has not chilled plaintiffs from filing suit. It has,

© ABA, The Business Lawyer, November, 1998

however, made early dismissal more commonplace. n180 In securing more early dismissals, the Reform Act is having its intended effect. Other provisions of the Reform Act, including the lead plaintiff provision and the safe harbor for forward-looking statements, have been less successful to date. There are reasons, several of which are discussed in the next section, to doubt that the Uniform Standards Act will significantly improve the performance of these provisions.

n176 SEC STAFF REPORT, *supra* note 54; STANFORD STUDY, *supra* note 39. The Stanford Study overlapped in certain areas with the SEC Staff Report. In addition, the Stanford Study found that high technology issuers continue to be named most often in class actions, federal claims are rarely filed against the largest issuers, and one plaintiffs' law firm appears in the majority of securities class actions. STANFORD STUDY, *supra* note 39, at ii-iv.

n177 SEC STAFF REPORT, *supra* note 54, at 80; STANFORD STUDY, *supra* note 39, at ii.

n178 SEC STAFF REPORT, *supra* note 54, at 5.

n179 *Id.* at 4, 22.

n180 *See infra* notes 208-12 and accompanying text.

### Scienter

One of the principal barriers erected by the Reform Act to the filing of securities class actions is its stringent standard for pleading scienter. n181 Under the Reform Act's heightened pleading standard, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." n182 This language mirrors the standard existing in the Second Circuit prior to adoption of the Reform Act. This standard was satisfied by alleging either (i) facts to show that defendants had both motive and opportunity to commit fraud, or (ii) facts that constituted strong circumstantial evidence of conscious behavior or recklessness. n183 Statements appear in the Reform Act's Statement of Managers to the effect that Congress intended to strengthen the Second Circuit standard. n184 The defense bar has seized on this legislative history to argue that recklessness no longer suffices as a basis to plead scienter. The dispute over the proper interpretation of the Reform Act's heightened pleading standards has created a split in the district courts. The rejection of recklessness by a significant number of federal district courts when interpreting the Reform Act's pleading standards is perhaps the major concern raised by the Uniform Standards Act's displacement of state law in favor of a national standard. n185

n181 SEC STAFF REPORT, *supra* note 54, at 28.

n182 15 U.S.C. § 78u-4(b)(2).

n183 Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

n184 Statement of Managers, *supra* note 3, at n.23 ("The Conference Committee chose not to include in the pleading standard certain language relating to motive, opportunity, and recklessness.").

n185 Since passage of the Reform Act, 11 courts have rejected recklessness as a basis for pleading scienter in securities fraud cases. *See In re* Gaming Lottery Sec. Litig., Fed. Sec. L. Rep. (CCH) P90,236, at 91,029 (S.D.N.Y. Jul. 22, 1998); *In re* Gaming Lottery Sec. Litig., 1998 U.S. Dist. LEXIS 7926 (S.D.N.Y. May 29, 1998); Chan v. Orthologic Corp., et al., No. CIV-96-1514-PHX-RCB (D. Ariz. Feb. 5, 1998) (dicta); *In re* Glenayre Technologies, Inc., Fed. Sec. L. Rep. (CCH) P99,571, at 97,829 (Dec. 10, 1997); *In re* Comshare, Inc. Sec. Litig., Case No. 96-73711-DT, 1997 U.S. Dist. LEXIS 17262 at * 5 (E.D. Mich. Sept. 18, 1997); *In re* Silicon Graphics Sec. Litig., 970 F. Supp. 746, 757 (N.D. Cal. 1997); Voit v. Wonderware Corp., 977 F. Supp. 363, 374 (E.D. Pa. 1997); Powers v. Eichen, 977 F. Supp. 1031, 1039 (S.D. Cal. 1997); Norwood Venture Corp. v.

Converse Inc., 959 F. Supp. 205, 208 (S.D.N.Y. 1997); Friedberg v. Discreet Logic, Inc., 959 F. Supp. 42, 48-49 (D. Mass. 1997); Havenick v. Network Express, Inc., 981 F. Supp. 480, 528 (E.D. Mich. 1997).

By contrast, 28 courts have held that allegations of recklessness continue to suffice. Scott v. Steingold, 1998 U.S. Dist. LEXIS 15810 (N.D. Ill. Sept. 30, 1998); Robertson v. Strassner, 1998 U.S. Dist. LEXIS 15861 (S.D. Tex. Oct. 8, 1998); Bryant v. Apple South, Inc., 1998 U.S. Dist. LEXIS 12125 (M.D. Ga. July 29, 1998); Allison v. Brooktree Corp., 999 F. Supp. 1342, 1343 (S.D. Cal. 1998); Varljen v. H.J. Meyers, Fed. Sec. L. Rep. (CCH) P90,259, at 91,146 (Aug. 19, 1998); Castillo v. Dean Witter Discover & Co., Fed. Sec. L. Rep. (CCH) P90,289, at 91,098 (Aug. 5, 1998); Walish v. The Leverage Group, Inc., Fed. Sec. L. Rep. (CCH) P90,229, at 90,983 (Jul. 8, 1998); Miller v. Material Sciences Corp., No. 97c2450, 1998 U.S. Dist. LEXIS 10052, at * 2 (N.D. Ill. June 25, 1998); Blum v. Semiconductor Packaging Materials Co., No. 97-7078, 1998 U.S. Dist. LEXIS 6868, at * 3 (E.D. Pa. May 5, 1998); Epstein v. Itron, Inc., Fed. Sec. L. Rep. (CCH) P90,157, at 90,460 (Mar. 11, 1998); Adair v. Bristol Technology Systems, Inc., 179 F.R.D. 126, 135 (S.D.N.Y. 1998); Zuckerman v. Foxmeyer Health Corp., 4 F. Supp. 2d 618, 622 (N.D. Tex. 1998); City of Painesville v. First Montauk Financial Corp., 180 F.R.D. 178, 187 (N.D. Ohio 1998); Weikel v. Tower Semiconductor Ltd., No. 96-3711, 1997 U.S. Dist. LEXIS 22229, at * 1 (D.N.J. Oct. 2, 1997); Gilford Partners L.P. v. Sensormatic Elec. Corp., No. 96C4072, 1997 U.S. Dist. LEXIS 13724, at * 5 (N.D. Ill. Sept. 10, 1997); Galaxy Inv. Fund, Ltd. v. Fenchurch Capital Management, Ltd., No. 96C8098, 1997 U.S. Dist. LEXIS 13207 (N.D. Ill. Aug. 29, 1997); Shahzad v. H.J. Meyers & Co., Inc., No. 95 Civ. 6196 (DAB), 1997 U.S. Dist. LEXIS 1128, at * 5 (S.D.N.Y. Feb. 6, 1997); In re Wellcare Management Group, Inc. Sec. Litig., 964 F. Supp. 632, 641 (N.D.N.Y. 1997); Page v. Derrickson, No. 96-842-CIV-T-17C, 1997 U.S. Dist. LEXIS 3673, at * 7 (M.D. Fla. Mar. 25, 1997); Pilarczyk v. Morrison Knudsen Corp., 965 F. Supp. 311, 320 (N.D.N.Y. 1997); OnBank & Trust Co. v. FDIC, 967 F. Supp. 81, 88 & n.4 (W.D.N.Y. 1997); Fugman v. Aprogenex, Inc., 961 F. Supp. 1190, 1195 (N.D. Ill. 1997); Rehm v. Eagle Fin. Co., 954 F. Supp. 1246, 1252-53 (N.D. Ill. 1997); In re Health Management Inc., 970 F. Supp. 192, 201-03 (E.D.N.Y. 1997); Fischler v. AmSouth Bancorporation, No. 96-1567-CIV-T-17A, 1996 U.S. Dist. LEXIS 17670, at * 3 (Nov. 14, 1996); STI Classic Fund v. Bollinger Indus., Inc., No. 3-96-CV-823-R, 1996 WL 885802, at * 1 (N.D. Tex. Oct. 25, 1996); Zeid v. Kimberley, 930 F. Supp. 431, 438 (N.D. Cal. 1996); Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1309 n.9 (C.D. Cal. 1996);.

A separate issue is whether allegations of motive and opportunity continue to suffice. The courts rejecting recklessness have generally also rejected motive and opportunity, while the courts continuing to allow recklessness tend to hold that motive and opportunity remains a valid basis for pleading scienter. Seven courts, however, have held that while allegations of recklessness survive, motive and opportunity, in and of itself, is no longer a valid basis to plead scienter. In re Health Management Sys., Inc., Fed. Sec. L. Rep. (CCH) P90,235, at 91,022 (S.D.N.Y. Jul. 22, 1998); Walther v. Maricopa Int'l Inv. Corp., Fed. Sec. L. Rep. (CCH) P90,203, at 90,741 (S.D.N.Y. May 20, 1998); In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1107 (D. Nev. 1998); Novak v. Kasaks, 997 F. Supp. 425, 430 (S.D.N.Y. 1998); Press v. Quick & Reilly Group, Inc., No. 96 Civ. 4278 (RPP), 1997 U.S. Dist. LEXIS 11609, at * 2, 5 (S.D.N.Y. Aug. 8, 1997); In re Baesa Sec. Litig., 969 F. Supp. 238, 242 (S.D.N.Y. 1997); Myles v. MidCom Communications, No. C96-614D (W.D. Wash. Nov. 19, 1996); see also In re Boeing Sec. Litig., 1998 U.S. Dist. LEXIS 14803, at * 38 (W.D. Wa. Sept. 8, 1998) (holding that "motive, opportunity, and non-deliberate recklessness may provide some evidence of intentional wrongdoing, but are not alone sufficient to support scienter unless the totality of the circumstances creates a strong inference of fraud").

Although the national standard mandated by the Uniform Standards Act offers increased predictability, that standard should be one that protects investors and deters fraud. Rejecting recklessness at the pleading stage calls into question its vitality as a basis for imposing liability. It would hardly make sense to find recklessness insufficient at the *pleading* stage, but sufficient to impose *liability*. The SEC has long taken the position that liability for reckless violators is essential to any investor protection scheme. A higher standard would allow corporate managers to turn a blind eye to evidence contradicting their public statements. n186 Accordingly, during the hearings on the Uniform Standards Act, the SEC made clear that it could not support a national fraud standard that did not impose liability upon reckless violators of the law. n187

n186 See, e.g., October 29 Hearing, supra note 14, at 13 ("A uniform federal standard that did not include recklessness as a basis for liability would jeopardize the integrity of the securities markets, and would deal a crippling blow to defrauded investors with meritorious claims.") (statement of SEC).

© ABA, The Business Lawyer, November, 1998

n187 *Id.* at 14 ("Should the courts of appeals conclude that the Reform Act has somehow eliminated reck-lessness as a basis for antifraud liability, the preservation of state remedies that allow recovery for reckless con-duct would be critical.").

In addressing the SEC's concern, the Senate sought to provide assurances in Senate Bill 1260's legislative history that the national standard would include liability for recklessness:

> The Committee emphasizes that the clear intent in 1995 and our continuing intent in this legislation is that neither the PSLRA nor S. 1260 in any way alters the scienter standard in federal securities fraud suits. It was the intent of Congress, as was expressly stated during the legislative debate on the PSLRA, and particularly during the debate on overriding the President's veto, that the PSLRA establish a uniform federal standard on pleading requirements by adopting the pleading standard applied by the Second Cir-cuit Court of Appeals. Indeed the express language of the PSLRA itself carefully provides that plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the re-quired state of mind." The Committee emphasizes that neither the PSLRA nor S. 1260 makes any at-tempt to define that state of mind. n188

A colloquy between Senators Christopher Dodd and Alfonse D'Amato on the Senate floor further emphasizes the point:

> *Mr. D'Amato:* I was surprised and dismayed to learn that some district court decisions had not followed the clear language of the '95 Reform Act, which is the basis upon which the uniform national standard in today's legislation will be created.
> *Mr. Dodd:* It appears that these district courts have misread the language of the '95 Reform Act's State-ment of Managers . . . I can only hope that when the issue reaches the federal courts of appeals, these courts will undertake a more thorough review of the legislative history and correct these decisions.
> *Mr. D'Amato:* I agree that investors must be allowed a means to recover losses created by reckless mis-conduct. . . .
> *Mr. Dodd:* I am glad that we have had this opportunity to clarify how the PSLRA's pleading standards will function as the national standard to be created in S. 1260. n189

This language and colloquy enabled both the SEC and the White House to support the Uniform Standards Act. n190

n188 S. REP. NO. 105-182, at 5-6 (1998). The House Report is silent on the scienter issue. A colloquy on the House Floor between Representatives Chris Cox and Anna Eshoo confirm that they also had not intended for the Reform Act to alter securities fraud scienter requirements. *See* H. REP. NO. H6061 (July 21, 1998).

n189 144 CONG. REC. S4798-99 (daily ed. May 13, 1998).

n190 *See* Letter from Chairman Arthur Levitt, Commissioner Isaac C. Hunt, Jr., and Commissioner Laura Unger to Senators Alfonse D'Amato, Phil Gramm, and Christopher Dodd (Mar. 24, 1998) (on file with *The Business Lawyer*, University of Maryland School of Law) ("We were gratified [to learn that you will] restate in S. 1260's legislative history, and in the expected debate on the Senate floor, that the Private Securities Litigation Reform Act of 1995 did not, and was not intended to, alter the well-recognized and critically important scienter standard. . . . We support enactment of S. 1260 with . . . this important legislative history."); Letter from Bruce Lindsey and Gene Sperling to Senators Alfonse D'Amato, Phil Gramm, and Christopher Dodd (Apr. 28, 1998) (on file with *The Business Lawyer*, University of Maryland School of Law) ("Since the uniform standards pro-vided by S. 1260 will provide that class actions generally can only be brought in federal court . . . it is particu-larly important to the President that you be clear that the federal law to be applied includes recklessness as a ba-sis for pleading and liability in securities fraud class actions. . . . So long as . . . appropriate legislative history

© ABA, The Business Lawyer, November, 1998

and floor statements on the subject of legislative intent are included in the legislative record, the Administration would support enactment of S. 1260."). Commissioner Norman Johnson dissented from the Commission's support. *See* Letter from Commissioner Norman Johnson to Senators Alfonse D'Amato, Phil Gramm, and Christopher Dodd (Mar. 24, 1998) (on file with *The Business Lawyer*, University of Maryland School of Law) ("I believe that much more conclusive evidence [of a problematic migration] than currently exists should be required before the state courthouse doors are closed to small investors.").

Recklessness' status as part of the national standard for pleading and proving fraud reemerged when the Conference Committee resolved the differences between the House and Senate version of the bill. The Conference Committee produced a Statement of Managers that takes up less than two pages in the Congressional Record, but the Committee nonetheless deemed recklessness important enough to devote five paragraphs to the issue under a separate heading entitled, "Scienter."

This Statement should help eliminate judicial confusion on the question of recklessness as a scienter standard. According to the Statement, "it is the clear understanding of the managers that Congress did not, in adopting the Reform Act, intend to alter the standards of liability under the Exchange Act." n191 When Congress passed the Reform Act, all of the courts of appeals that had addressed that question had held that recklessness suffices to prove scienter in a securities fraud action. n192 Recklessness should continue under the national standard as a sufficient state of mind to find a defendant liable in a securities fraud class action, unless the U.S. Supreme Court rejects the unanimous interpretation of the courts of appeals.

n191 Statement of Managers, *supra* note 3.

n192 *See* Walker & Levine, *supra* note 23, at 30 (collecting cases).

The Statement also makes clear that "it was the intent of Congress . . . that the Reform Act establish a heightened uniform federal standard on pleading requirements *based upon* the pleading standard applied by the Second Circuit Court of Appeals." n193 This language is more emphatic than the language in the Reform Act's Statement of Managers which stated that the pleading standard is "based in part" on the Second Circuit standard. n194 The words "in part" had muddied the waters for district courts attempting to interpret the Reform Act. Recklessness has always been a key component of the Second Circuit pleading standard, and the clear language of the Statement of Managers reaffirming the viability of that standard allowed the SEC to support the final bill and the President to sign it into law. n195

n193 Statement of Managers, *supra* note 3 (emphasis added).

n194 *Id.*

n195 Statement by President William J. Clinton (Nov. 3, 1998) (signing Uniform Standards Act into law) (on file with *The Business Lawyer*, University of Maryland School of Law); Letter from Arthur Levitt, Chairman, SEC; Isaac C. Hunt, Jr., Commissioner, SEC; Paul R. Carey, Commissioner, SEC; Laura S. Unger, Commissioner, SEC, to The Honorable Alfonse M. D'Amato, Chairman, Committee on Banking, Housing & Urban Affairs and The Honorable Paul S. Sarbanes, Ranking Minority Leader, Committee on Banking, Housing & Urban Affairs (Oct. 9, 1998) (on file with *The Business Lawyer*, University of Maryland School of Law).

Notwithstanding the position adopted by the Statement of Managers, the debate over the continuing validity of recklessness as a basis to plead and prove fraud seems destined to continue. Evidently unable to get their way at Conference, two members of the House engaged in a colloquy at the time of passage attacking recklessness and the Second Circuit pleading standard. n196 Moreover, one of these members inserted a statement arguing there is no statutory basis for liability based on recklessness. n197 The colloquy triggered a number of contrary statements by other members of Congress. n198

n196 *See* 144 CONG. REC. H10780-H10781 (colloquy between Representatives Tom Bliley and Chris Cox).

© ABA, The Business Lawyer, November, 1998

n197 The circumstances surrounding the original insertion of this statement into the record, as well as the original printing of the Statement of Managers, generated further controversy. Representative John D. Dingell observed:

> The final page [of the Statement of Manager, as originally printed] mysteriously dis-appeared. Curiously, this page contained important language regarding scienter, recklessness, and the pleading standard applied by the Second Circuit Court of Appeals, language essential to the conference agreement. . . . The unidentified material that follows the names of the Managers [i.e., the Bliley Statement], although erroneously printed in the same typeface as the conference report, . . . is not part of the conference report's joint explanatory statement and does not represent the view of the Managers. In point of fact, the phantom language directly contradicts the joint explanatory statement. . . ."

144 CONG. REC. E2246 (daily ed. Oct. 20, 1998). Both printing errors were subsequently corrected.

n198 *See* Statement of Senator Alfonse D'Amato, 144 CONG. REC. S12738 (daily ed. Oct. 20, 1998); Statement of Senator Jack Reed, 144 CONG. REC. S12906 (daily ed. Oct. 21, 1998); Statement of Senator Patrick Leahy, 144 CONG. REC. S12737 (Oct. 20, 1998); Statement of Representative John D. Dingell, 144 CONG. REC. E2246 (Oct. 20, 1998); Statement of Edward J. Markey, 144 CONG. REC. H10781 (daily ed. Oct. 13, 1998); Statement of Anna Eshoo, 144 CONG. REC. E2296 (Oct. 21, 1998).

The issue of whether recklessness suffices to plead scienter will soon be addressed in three cases pending in the federal courts of appeal. n199 The decisions in these cases will likely provide a clear answer to whether the Uniform Standards Act prematurely displaced state law. Should recklessness be lost, further legislation will be needed to restore it as part of the national standard. Indeed, Senator Dodd has pledged to introduce such legislation if the U.S. Supreme Court holds that recklessness does not suffice as a basis for pleading and proving fraud. n200

n199 The first decision should come from the Ninth Circuit in *In re Silicon Graphics Securities Litig.*, No. 97-16240 (9th Cir.). Oral argument was held on June 11, 1998 and a decision is pending. The issue was again heard by the Ninth Circuit in *Zeid v. Kimberley*, No. 97-16070 (9th Cir.). The issue will also soon be addressed by the Sixth Circuit in *Hoffman v. Comshare, Inc.*, No. 97-2098 (6th Cir.) (oral argument has not yet been calendared). The Commission has appeared as *amicus curiae* in all three cases arguing in favor of the Second Circuit standard.

n200 *See* 144 CONG. REC. S4798 (daily ed. May 13, 1998) ("Should the Supreme Court eventually find that recklessness no longer suffices to meet the scienter standard, it is my intent to introduce legislation that would explicitly restore recklessness as the pleading and liability standard for federal securities fraud lawsuits.").

### The Discovery Stay

The Reform Act's discovery stay also presents a substantial obstacle to maintaining a securities fraud suit. n201 The Reform Act stays discovery pending a motion to dismiss unless the court finds that particularized discovery is necessary to preserve evidence or prevent undue prejudice. n202 The stay is designed to banish "fishing expedition" lawsuits in which defendants are often forced to settle rather than incur the burdensome costs of discovery. n203 During the hearings that led to the Reform Act, Congress heard testimony that discovery accounts for approximately 80% of defense costs in securities class actions. n204

n201 SEC STAFF REPORT, *supra* note 54, at 15.

n202 15 U.S.C. § 78u-4(b)(3)(B).

n203 H.R. CONF. REP. NO. 104-369, at 37 (1995).

© ABA, The Business Lawyer, November, 1998

n204 *Id.*

The stay has been rigorously enforced at the federal level. It has been held to extend to disclosure required by Federal Rule Civil Procedure 26(a), n205 to remain in place pending reconsideration of a motion to dismiss, and to afford protection to non-parties. n206 More tellingly, a court has lifted the stay in only one out of the 280 cases filed during 1996 and 1997. n207 For those issuers that succeed with their motions to dismiss, the costs of defending non-meritorious securities fraud actions should be greatly reduced.

n205 28 U.S.C. § 26(a) (1994 & Supp. II 1997).

n206 *See* Medhekar v. U.S. District Court, 99 F.3d 325 (9th Cir. 1996) (holding that the discovery stay also encompasses the disclosures mandated by FED. R. CIV. P. 26(a)); Powers v. Eichen, Fed. Sec. L. Rep. (CCH) P99,552, at 97,757 (S.D. Cal. June 2, 1998) (continuing to stay discovery during the court's reconsideration of its ruling on a motion to dismiss); *In re* Trump Hotel Shareholder Derivative Litig., Fed. Sec. L. Rep. (CCH) P99,537, at 97,653 (S.D.N.Y. Oct. 15, 1997) (imposing discovery stay in a derivative action alleging a federal securities law claim); Kane v. Madge Networks N.V., Case No.: C96-20652 RMW (N.D. Cal., Jan. 13, 1997) (affording protection of the discovery stay to non-parties) (on file with *The Business Lawyer*, University of Maryland School of Law); Novak v. Kasaks, Fed. Sec. L. Rep. (CCH) P99,307, at 95,861 (S.D.N.Y. Sept. 15, 1996) (same). *But see* Levy v. United HealthCare Corp, Civ. No. 3-96-750 (D. Minn. Sept. 10, 1996) (allowing FED. R. CIV. P 26(a) disclosure to go forward notwithstanding a motion to dismiss) (on file with *The Business Lawyer*, University of Maryland School of Law).

n207 *See In re* Websecure, Inc. Sec. Litig., Fed. Sec. L. Rep. (CCH) P90,112, at 90,153 (D.Mass. Jan. 23, 1998) (granting limited relief from the stay in an action seeking injunctive relief so that the plaintiffs could conduct expedited discovery concerning the viability of the defendant to continue as an operating business); *see also* Mishkin v. Ageloff, 220 Bankr. 784 (S.D.N.Y 1998) (reversing decision of bankruptcy court judge which granted trustee relief from discovery stay). Other requests by plaintiffs for relief from the stay have been denied. *See* Novak v. Kasaks, 1996 U.S. Dist. LEXIS 11778 (S.D.N.Y. Aug. 16, 1996); Medical Imaging Ctrs. of Am., Inc. v. Lichtenstein, 917 F. Supp. 717 (S.D. Cal. 1996).

The stay, however, has been easily avoided. Although strictly applied in federal court, the stay was circumvented prior to the Uniform Standards Act by filing in state court. It remains to be seen whether the Uniform Standards Act's stay provision (along with its preemption provisions) will end the dual-track litigation that undermines the discovery stay.

### *Statistical Analysis of Rulings on Motions to Dismiss*

The effect of the Reform Act's heightened pleading standards and discovery stay is reflected in the increased percentage of motions to dismiss being granted by district courts. In the 280 class actions filed during 1996 and 1997, the authors have gathered 100 rulings on a motion to dismiss. n208 As the following chart illustrates, more than half (60%) have been granted in some form. Fifteen were granted with prejudice; thirty-four were granted with leave to amend; and eleven were granted in part and denied in part.

n208 Although mainly class actions, this total does include nine individual actions. It also includes actions filed post-Reform Act but dismissed on non-Reform Act grounds. If the opinion or order does not specify dismissal with prejudice, it was counted as without prejudice.

This dismissal rate appears to be significantly higher than pre-Reform Act. For instance, Congress heard evidence that in 1992 approximately 40% of all federal securities class actions were dismissed on motion prior to trial. n209 Available data also shows that in 1990 and 1991, 38% of the cases filed by a leading plaintiffs' law firm were dismissed on motion. n210 In addition, data provided by the Big Six accounting firms shows that for the years 1990 to 1992, they were successful on motions to dismiss 33%, 24%, and 40% of the time, respectively. n211 This evidence confirms that the Reform Act's heightened pleading standards and discovery stay have made it more difficult for plaintiffs to succeed in federal securities class actions.

© ABA, The Business Lawyer, November, 1998

n209 *See Testimony of Professor Joel Seligman, Univ. of Michigan Law School, Before the Subcomm. on Telecom. & Fin. of the House Comm. on Energy & Commerce* (Aug. 10, 1994).

n210 *Id.*

n211 *Id.*

Closer analysis of the dismissal data reveals that the Northern District of California, home to Silicon Valley and more securities class actions than any other district, has adopted particularly stringent pleading standards. Post-Reform Act, nine out of ten motions to dismiss have been granted in this district, at least in part. n212 This high dismissal rate, along with other factors, including defendant-friendly local rules n213 and decisions calling recklessness into question, suggest that the Northern District of California has become an inhospitable forum for securities class actions. This higher dismissal rate in the Northern District reflects the dramatic change in pleading practices in the Ninth Circuit. Pre-Reform Act, the Ninth Circuit allowed scienter to be averred generally, that is, simply by saying it existed. n214 The Reform Act's pleading standards have brought the Ninth Circuit into conformity with the more rigorous requirements imposed by the Second Circuit and other circuits.

n212 The denial came in *Hoffman v. Avant! Corp.*, 1997 U.S. Dist. LEXIS 21823 (N.D. Cal. Dec. 18, 1997).

n213 In March 1997, the U.S. District Court for the Northern District of California implemented several new local rules which, among other things, keep the discovery stay in place until a lead plaintiff is chosen. The local rules also require all parties to post most court filings on a "Designated Internet Site." The local rules can be found at <http://securities.stanford.edu>.

n214 *In re* GlenFed Sec. Litig., 42 F.3d 1541 (9th Cir. 1994).

**Rulings on Motions to Dismiss**

[SEE ILLUSTRATION IN ORIGINAL]

*Litigation Rates*

The increased rate of dismissal for securities class actions has not produced a reduction in the number of filings; rather, the rate of filing appears to have *increased*. The number of companies sued in federal court dropped during 1996, the first year of practice under the Reform Act. The SEC Staff Report found that 105 companies were sued in federal court during 1996, compared to 158 in 1995, 221 in 1994, and 153 in 1993. n215 As the following chart illustrates, however, the 175 filings in 1997 marked a return to pre-Reform Act levels.

n215 SEC STAFF REPORT, *supra* note 54, at 20-21. NERA's numbers as to the number of federal class action filings is: 1991 (153), 1992 (192), 1993 (158), 1994 (220), and 1995 (162). NERA STUDY, *supra* note 39, at Table 1. The Stanford Study relied on NERA for the 1991 to 1995 federal filing numbers. STANFORD STUDY, *supra* note 39, at 6. The Stanford Study found 124 companies sued in federal class actions during 1996 (annualized number). *Id.* at 4.

The 175 companies sued in federal securities class actions during 1997 is on par with the 177 suit average during the three years leading up to passage of the Act. Moreover, the authors have counted 118 companies that have been sued in federal securities class actions during the first six months of 1998. This projects to an annualized total of 236, the highest [SEE ILLUSTRATION IN ORIGINAL] total in recent years. This evidence shows that the Reform Act has done little to reduce the number of class action filings.

**Rate of Federal Filings**

The increased dismissal rate for class actions may be causally related to the increased number of filings seen in 1997 and 1998. The plaintiffs' lawyers operate by holding a diversified portfolio of lawsuits rather than investing all of

their firms' resources in any one claim. The increased rate of dismissals means that firms will have to file more suits in order to get the same return from their portfolios. Plaintiffs' lawyers may find it difficult to determine the merits of a lawsuit before filing it, given their lack of access to the defendants' records and state of mind. In addition, there remains considerable uncertainty concerning the Reform Act's pleading standards. Given these uncertainties, bringing additional suits may be a rational response to the higher dismissal rate.

### The Safe Harbor

Securities Act Rule 175, n216 promulgated by the SEC, gave safe harbor protection to forward-looking statements in documents filed with the Commission. n217 The safe harbor offered no protection, however, if statements were prepared without a reasonable basis in fact or were disclosed other than in good faith. n218 Surveys showed that Rule 175 did little to encourage issuers to disclose forward-looking information to the marketplace. n219 It was widely believed that Rule 175 did not provide adequate comfort against the specter of expensive class action litigation should the projection or development cited in the forward-looking statement not materialize. n220 Particular criticism was aimed at the facts that Rule 175 only covered statements made in documents filed with the Commission, and, by using a factually-oriented test of good faith and reasonableness, it prevented early dismissal before discovery. n221

n216 17 C.F.R. § 230.206 (1998).

n217 Safe Harbor Rule for Projections, Securities Act Rel. No. 6084 (June 25, 1979).

n218 *Id.* A corresponding Exchange Act rule, Rule 3b-6, was simultaneously adopted.

n219 *See* American Stock Exchange CEO Survey, Securities Litigation and Stock Option Accounting (April 1994) (noting that 54% of the 218 executives of AMEX-listed companies stated that the prospect of litigation affected their decision to disseminate forward-looking information); Statement of Kenneth McLennan, President, Manufacturers Alliance for Productivity and Innovation, Inc. on Safe Harbor for Forward-Looking Statements to the SEC (Jan. 11, 1995) (The Alliance has 500 member companies, all involved in the manufacturing industry. Mr. McLennan's statement announced results of a member survey finding that only 17% make forward-looking statements.).

n220 Concept Release, Safe Harbor for Forward-Looking Statements, Securities Act Rel. No. 7101, 1994 SEC LEXIS 3099, at * 30 (Oct. 1994).

n221 *Id.* at * 32-* 34.

In enacting the Reform Act's safe harbor, Congress sought to respond to these problems with Rule 175. n222 Unlike Rule 175, the Act's safe harbor covers all forward-looking statements whether or not made in documents filed with the Commission. n223 In addition, the "meaningful" cautionary language prong is meant to allow for the early and inexpensive dismissal of suits when appropriate because it allows for objective determination by a judge. n224 The motions to dismiss issued to date decided on the basis of the safe harbor confirm that it affords issuers greater protection than Rule 175. n225 If the trend established by the opinions continues, issuers should be more forthcoming with projections. The cases to date, all decided by district courts, address the following questions.

n222 S. REP. NO. 104-98, at 16 (1995) (stating that Rule 175 "has not provided companies meaningful protection from litigation").

n223 Securities Act § 27A, 15 U.S.C. § 77aa(A); Exchange Act § 21E, 15 U.S.C. § 78p(E).

n224 *See* Statement of Managers, *supra* note 3, at 44 ("The use of the words 'meaningful' and 'important factors' are intended to provide a standard for the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss, without examining the state of mind of the defendant.").

© ABA, The Business Lawyer, November, 1998

n225 *See infra* notes 226-42 and accompanying text.

*What is a "Forward-Looking Statement"?*

In *Harris v. IVAX Corp.*, n226 the court liberally construed what counts as a forward-looking statement for purposes of the safe harbor. n227 The court deemed the statement, "we believe that the challenges unique to this period in our history are behind us," to be forward-looking because in the court's view the statement equated to "despite the rough period, good times are ahead." n228 In addition, the court deemed IVAX's failure to disclose the impaired value of its good will to be forward-looking because it reflected a judgment that goodwill was strong and would not be written down anytime soon. n229 The court afforded safe harbor protection upon finding that the warnings accompanying the disclosure were tailored to IVAX's particular situation and were not boilerplate. n230 In other cases, present tense statements having no forward-looking implication have been denied safe harbor coverage. n231 In addition, statements of present fact cannot be couched as assumptions underlying a projection to receive the benefit of the safe harbor. n232

n226 998 F. Supp. 1448 (S.D. Fla. 1998).

n227 *Id.* at 1449, 1453.

n228 *Id.* at 1453.

n229 *Id.*

n230 *Id.* at 1454.

n231 *See* Robertson v. Strassner, 1998 U.S. Dist. LEXIS 15861, at * 21 (S.D. Tex. Oct. 7, 1998); *In re* Olympic Fin. Ltd. Sec. Litig., 1998 U.S. Dist. LEXIS 14789, at * 13-14 (D. Minn. Sept. 10, 1998).

n232 *In re* Boeing Sec. Litig., 1998 U.S. Dist. LEXIS 14803, at * 22 (W.D. Wash. Sept. 8, 1998).

*How Much Risk Factor Disclosure Is Necessary?*

The answer appears to be some but not all. In a brief opinion, the court in *Rasheedi v. Cree Research, Inc.*, n233 dismissed the complaint after finding that a discussion of one of the factors to cause the results to differ was included. The court found that the failure to discuss other factors was irrelevant. Following the Reform Act's legislative history, the court held that "Defendants must identify significant factors that may cause results to materially differ--*but not all factors*." n234 It has been held, however, that boilerplate disclosure will not suffice. n235

n233 1997 U.S. Dist. LEXIS 16968 Nos. 1:96CV00890, 1:96CV01069 (M.D.N.C. Oct. 17, 1997).

n234 *Id.* at * 1 (emphasis added); *see also IVAX Corp.*, 998 F. Supp. at 1454 (same).

n235 *See In re Boeing*, 1998 U.S. Dist. LEXIS, at * 21.

*How May the Knowledge Prong Be Satisfied?*

At the pleading stage, the Reform Act requires that plaintiffs present evidence supporting allegations of knowing misstatements. In *IVAX*, the court held that plaintiffs pleading that defendants acted with knowledge may not rely on "conclusory allegations." n236 The same holding was reached by the court in *In re Advanta Corp. Securities Litigation*. n237 In addition, it has been held that the allegation that "defendants knew or were reckless in failing to know" that the projection was false would not survive the effect of the safe harbor. n238

© ABA, The Business Lawyer, November, 1998

n236 *IVAX Corp.*, 998 F. Supp. at 1454.

n237 No. 97-CV-4343, 1998 U.S. Dist. LEXIS 10189 at * 30 (E.D. Pa. July 9, 1998) ("Plaintiffs' catch-all allegation that all speakers knew that their statements were false when made is too broad. . . .").

n238 Clark v. TRO Learning, Inc., No. 97 C 8683, 1998 U.S. Dist. LEXIS 7989, at * 5 (N.D. Ill. May 20, 1998).

In refusing to dismiss claims pursuant to the safe harbor, the U.S. District Court for the District of Nevada has commented, "the shortness of time between later revealed truth and prior statements can be circumstantial evidence that the optimistic statements were false or misleading when made." n239 The court added, however, that absence of a catastrophic event between the time the projection is made and the truth pans out does not create a presumption that defendants knew the projection was false when made. n240

n239 *In re* Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1112 (D. Nev. 1998).

n240 *Id.*

*How Often Must the Safe Harbor Be Invoked When Making Oral Projections?*

*Wenger v. Lumisys, Inc.* n241 provides guidance on this issue. The plaintiffs argued that, in the course of a conference call with analysts, the defendant's executives were required to identify each projection as a forward-looking statement and to indicate that actual results might materially differ. The court held that requiring these cautionary statements to be recited each time an oral projection is made would be absurd and unwieldy. n242 Rather, a blanket statement at the beginning of the call suffices.

n241 2 F. Supp. 2d 1231 (N.D. Cal. 1998).

n242 *Id.* at 1242.

Despite the protections afforded by the Reform Act safe harbor, it seems that the issuer community is not taking full advantage of it. Based on interviews of issuers and regular staff review of filings, the SEC Staff Report found that "companies have been reluctant to provide significantly more forward-looking disclosure beyond what they provided prior to enactment of the safe harbor." n243 Issuers offered a handful of reasons for their reluctance to utilize the safe harbor, including fear of liability in state court, where the safe harbor does not expressly apply. Other reasons offered included uncertainty as to how courts would interpret the inherently ambiguous term "meaningful" cautionary language, and concern that inclusion of a cumbersome list of risk factors would make the company's disclosures unappealing. n244

n243 SEC STAFF REPORT, *supra* note 54, at 5.

n244 *Id.* at 25-26.

A recent study reaches the opposite conclusion. n245 The study examined whether 547 computer, software, and drug firms provided more earnings and sales forecasts in the year following passage of the Reform Act as compared to the year prior to passage. n246 The study found the following frequency of forecasts: n247

[SEE TABLE IN ORIGINAL]

n245 Marilyn Johnson et al., The Impact of Securities Litigation Reform on the Disclosure of Forward-Looking Information by High Technology Firms, Research Paper No. 1471 (Jan. 1998) (on file with *The Business Lawyer*, University of Maryland School of Law).

© ABA, The Business Lawyer, November, 1998

n246 *Id.* at 12.

n247 *Id.* at 28.

The study concludes that "there was a significant post-Act increase in both the frequency of firms issuing forecasts and the mean number of forecasts issued." n248

n248 *Id.* at 23.

A review of the underlying data, however, leads the authors to question this conclusion. The number of firms making one or more forecasts is not materially greater in the post-Act period. The only apparent material change is that twenty-six firms (5% of the sample) that did not make a forecast in the pre-Act period did so in the post-Act period. n249 This slight increase does not establish the Reform Act's safe harbor as a success. *More than half* the firms comprising the sample (51%) continue to refrain from forward-looking disclosure post-Reform Act. The disclosure study further finds that of those companies issuing projections, the mean number issued increased from 2.1 prior to the Reform Act to 2.5 after its passage. n250 Although the increase suggests that the safe harbor is having some effect, the increase is small, and presumably less than Congress expected when it passed the Reform Act.

n249 *Id.* at 14.

n250 *Id.* at 12.

Although some form of preemption is necessary to promote the use of safe harbor, we doubt that the Uniform Standards Act will stimulate much additional disclosure. The Uniform Standards Act does nothing to resolve issuers' concern over watering their disclosure down with an unattractive laundry list of risk factors. More importantly, concerns as to what is meant by "meaningful" cautionary language will continue until more courts provide guidance. Judicial interpretation of this term will have far greater effect than preemption on the use of the safe harbor by issuers.

One very real benefit provided by the Uniform Standards Act's extension of safe harbor protection is that it gives companies some protection against the spate of lawsuits anticipated to arise out of companies' failed efforts to deal with the "Year 2000" problem. It is likely that a substantial number of companies will have problems updating their computer systems to deal with the transition to the next millennium. Inevitably, securities fraud lawsuits based on inadequate or misleading disclosures will follow. n251 The safe harbor for forward-looking statements should give companies currently making Year 2000 disclosures comfort that they are not exposing themselves to liability down the road. n252 The Uniform Standards Act gives some assurance that state law will not undermine that protection.

n251 *See* Armond Budish, *Flood of Millennium Litigation Coming*, THE PLAIN DEALER, May 31, 1998, at 7J (noting how Year 2000 litigation-related seminars are already taking place throughout the country).

n252 *See* Statement of the Commission Regarding Disclosure of Year 2000 Issues and Consequences by Public Companies, Investment Advisers, Investment Companies, and Municipal Securities Issuers, Securities Act Rel. No. 7558, at 14 (July 29, 1998) ("The statutory safe harbors apply to forward-looking statements provided by eligible companies. Almost all of the required MD&A disclosures concerning Year 2000 problems contain forward-looking statements.").

### The Lead Plaintiff Provision

One of the central goals of the Reform Act was to transfer control of securities class actions from plaintiffs' lawyers to institutional investors. n253 Congress believed that, as America's largest shareholders, institutions should presumptively be the most responsible lead plaintiffs. n254 Accordingly, the Reform Act encourages institutional control of class actions. Within sixty days of notice that a complaint has been filed, any class member may move to be named lead plaintiff. n255 A rebuttable presumption exists that the most adequate plaintiff is the class member or group of members having the largest financial interest in the relief sought in the case. The most adequate plaintiff selects class counsel, subject to court approval.

n253 Statement of Managers, *supra* note 3, at 30.

n254 *Id.* at 34.

n255 15 U.S.C. § 78u-4(a)(3)(A).

Prior to the Reform Act, lawyers raced to the courthouse to be the first to file because the first filer was generally named lead plaintiff. More importantly, the lawyer for the lead plaintiff was generally named class counsel, thereby controlling the litigation and commanding the lion's share of lawyers' fees. n256 In enacting the lead plaintiff provision, Congress sought to replace alacrity in filing a complaint with accountability to investors as the central criterion for selecting lead counsel.

n256 Statement of Managers, *supra* note 3, at 33.

The Staff Report found that the "race to the courthouse" by the plaintiffs' bar had slowed somewhat. During the first year after the passage of the Reform Act, complaints were being filed an average of 79 days after the release of bad news, as opposed to an average of 49 days before the Act. n257 The race appears to be back on. Plaintiffs' firms are again competing to file the first complaint so they can be the first to publish notice of the suit. Notice is used to attract potential clients; when grouped together, they can secure lead plaintiff status, and thus, lead counsel position for the plaintiffs' lawyer. n258 A recent sampling of 21 of the 1997 class actions found that 6 had been filed within a week of release of the bad news and a few had been filed within 48 hours. Of course, the Reform Act does not prohibit the quick filing of a complaint. The Act's heightened pleading standards, however, require detailed factual allegations of wrongdoing. n259 Detailed allegations may be difficult to generate if complaints are being filed within 48 hours of an adverse disclosure. Complaints hastily thrown together may not fare well when faced with a motion to dismiss under the new heightened pleading standards.

n257 SEC STAFF REPORT, *supra* note 54, at 23.

n258 The Internet has replaced newspaper print as the standard for publication. This allows for worldwide distribution as well as perpetual access through searches of online newswire databases. As a result the Internet is now awash with such notices. For example, we ran a computer search finding 57 different notices relating to the class action against Cendant Corporation alone.

n259 Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified as amended in scattered sections of 15 U.S.C.).

Institutions have not actively sought lead plaintiff status. In the 105 class actions filed in 1996, the SEC Staff Report found only 8 (8% of the cases) in which institutions moved to be named lead plaintiff. n260 Institutional involvement declined further in 1997. n261 In the 175 cases filed, institutions have sought lead plaintiff status in only 9 (5%). n262 The promise of the lead plaintiff provision remains unfulfilled, with plaintiffs' lawyers continuing to call the shots in securities class actions. n263

n260 *Testimony of Arthur Levitt, Chairman, SEC, Concerning the Implementation of the Private Securities Litigation Reform Act of 1995 Before the Subcomm. on Fin. and Hazardous Materials Comm. on Commerce*, at 7 n.7 (Oct. 21, 1997) [hereinafter *October 21 Levitt Testimony*] (listing the following cases: Cellstar Corp. (N.D. Tex.) (State of Wisconsin Investment Board); IVAX Corp. (S.D. Fla.) (Pennsylvania School Employee Retirement System Pension Fund); Fleming Cos. (W.D. Okla.) (City of Philadelphia, acting through its Board of Pensions and Retirement); *In re* Summit Technology Sec. Litig. (D. Mass.) (Teachers' retirement System of Louisiana); Micro Warehouse, Inc. (D. Conn.) (Teachers' Retirement System of Louisiana & Pennsylvania School Employees Retirement System Pension Fund); In re Cephalon, Inc. Sec. Litig. (E.D. Pa.) (Sands Point Partners, L.P.); Pepsi-Cola Puerto Rico Bottling Co. (S.D. Fla.) (Sweet-water Investments, Inc.); OrthoLogic Corp. (D. Ariz.) (City of Philadelphia)). An institutional investor apparently has sought lead plaintiff status in a ninth case. *See In re* Donnkenny Inc. Sec. Litig. (Emanon Partners, L.P.), 1998 WL 299931 (S.D.N.Y. June 8, 1998).

n261 *October 21 Levitt Testimony, supra* note 260, at 7.

n262 *Id.* at 8 n.8 (listing the following cases: Boston Chicken (D. Colo.) (Teachers' Retirement System of Louisiana); Molten Metals (D. Mass.) (Louisiana State Employees' Retirement System); Mercury Finance (N.D. Ill.) (Minnesota State Board of Investment); Scholastic Corp. (S.D.N.Y.) (City of Philadelphia, acting through its Board of Pensions and Retirement); U.S.A. Detergents (D.N.J.) (City of Philadelphia, acting through its Board of Pensions and Retirement); Medaphis (N.D. Ga.) (Pennsylvania School Employees' Retirement System Pension Fund)); *see also In re* Oxford Health Plans, Inc. Sec. Litig., 1998 U.S. Dist. LEXIS 10694 (S.D.N.Y. July 15, 1998) (Colpera); Joseph Herman v. Waste Management, Inc., No. 97 C 8769 (N.D. Ill.Jan. 28, 1998) (City of Philadelphia); Blaich v. Employee Solutions, Inc., 1997 WL 842417 (D. Ariz. Nov. 21, 1997) (City of Philadelphia).

n263 In addressing a group of lawyers, SEC Chairman Levitt expressed his concern over lack of institutional involvement as lead plaintiff: "I do not want to urge you to advise your clients to plunge in, headlong, into every suit that comes your way. But, in order to carry out the intent of the new law, members of the bar should certainly urge their institutional clients to explore their options more fully." Arthur Levitt, Remarks at the Practicing Law Institute 29th Annual Institute on Securities Regulation (Nov. 7, 1998) (available at <http://www.sec.gov/statements & digests/speeches>).

Even in those instances when institutions come forward, there is no guarantee they will be named lead plaintiff. In a class action against Oxford Health Plans, Inc., the Colorado Public Employees Retirement Association (COLPERA) sought to be named lead plaintiff. n264 With approximately $ 20 million in losses, COLPERA had the largest financial stake in the class action. Nonetheless, two other parties made motions to join COLPERA as co-lead plaintiffs. n265 COLPERA objected to the motions. The SEC filed an amicus brief arguing that, assuming COLPERA otherwise qualified as lead plaintiff, it should be appointed sole lead plaintiff: "Allowing dispersal of the lead plaintiff's role among two or more competing plaintiffs would diminish the ability of a single lead plaintiff to control the litigation, and would deter institutional investors from serving in that role." n266 Apparently influenced by the cost and magnitude of the case, the court declined to adopt the SEC's argument and appointed all three parties as co-lead plaintiffs. n267 Dividing responsibility among three parties may detract from the lead plaintiffs' monitoring of class counsel, a central goal of the lead plaintiff provision. Other courts have also not warmly greeted motions by institutions to serve as lead plaintiff. n268

n264 *In re* Oxford Health Plans, Inc. Sec. Litig., 1998 U.S. Dist. LEXIS 10694 (S.D.N.Y. July 15, 1998). COLPERA's motion requesting certification for interlocutory appeal was denied. *In re* Oxford Health Plans, Inc., 1998 U.S. Dist. LEXIS 12167 (S.D.N.Y. Aug. 5, 1998).

n265 *Oxford Health*, 1998 U.S. Dist. LEXIS 10694, at * 5.

n266 Memorandum of the Securities and Exchange Commission, Amicus Curiae, *In re* Oxford Health Plans, Inc. Sec. Litig., No. 7:97-8023 at 3 (CLB) (S.D.N.Y. May 20, 1998) (on file with *The Business Lawyer*, University of Maryland School of Law).

n267 *Id.* at 8-10. Other cases have specifically declined to appoint multiple lead plaintiffs. *See, e.g., In re* Donnkenny Inc. Sec. Litig., 171 F.R.D. 156 (S.D.N.Y. 1997).

n268 *See, e.g.*, Memorandum Opinion, Lapierriere v. Vesta Insurance Group, Civil Action No. 98-AR-1407-S (N.D. Ala. Oct. 19, 1998) ("The court is unable and/or unwilling to decide between the competing plaintiff groups [one group is actually the Florida State Board of Administration alone] and therefore will do the unprecedented and declare a tie to be resolved by the tossing of a coin.") (on file with *The Business Lawyer*, University of Maryland School of Law).

Institutions, while not actively seeking lead plaintiff status, have pursued their rights in other ways: bringing individual anti-fraud actions, n269 bringing derivative actions, n270 writing to courts to object to settlements, n271 supporting other institutions as lead plaintiffs, n272 and acting as court-appointed "monitors" of litigation. n273 These efforts suggest that institutional investors are following the progress of class actions that affect their interests. The lead plaintiff provision, however, does not often give them adequate incentive to take the entire responsibility for serving as lead plaintiff in most cases.

> n269 *See October 21 Levitt Testimony, supra* note 260, at n.11 (listing the following: Bay Network (Florida State Board of Administration); Informix (Teachers' Retirement System of Louisiana and Florida State Board of Administration each brought individual actions); D'Hondt v. Digi Int'l Inc., No. 97-440, 1997 WL 405668 (D. Minn. Apr. 3, 1997) (Louisiana State Employees' Retirement System); Micro Warehouse (Florida State Board of Administration); *In re* Summit Medical Systems, Inc. Sec. Litig., No. 97-558, 1998 WL 353829 (D. Minn. June 29, 1998) (Teachers' Retirement System of Louisiana); and Mercury Finance (T. Rowe Price)).

> n270 *See Largest Pension Fund Throws Weight Behind Columbia Suit*, ANDREWS HEALTH CARE FRAUD LITIG. REP., at 3 (Oct. 1997) (discussing *McCall v. Scott*, No. 97-0838 (M.D. Tenn.) (derivative suit brought by H. Carl McCall, as Comptroller of the State of New York and as Trustee of the New York State Common Retirement Fund against Columbia/HCA Healthcare Corporation)); State Board of Administration of Florida v. Averhoff, No. 97-2729-I (Nashville Chancery Ct.) (similarly styled derivative action against Columbia/HCA Healthcare Corporation).

> n271 For example, in a class action against Horizon/CMS Healthcare Corp., the State of Wisconsin Investment Board and the Colorado Public Employees' Retirement Association objected to the one-third fee sought by the lawyers; the institutions asked the judge to award 17.5%. The California Teachers' Retirement System wrote to the court joining in the objection. The judge reduced the fee to 20%. *See* Dean Starkman, *Institutions are Challenging Legal Fees*, WALL ST. J., Sept. 30, 1997, at B14.

> n272 *See* Gluck v. Cellstar, 976 F. Supp. 542, 545 n.4 (N.D. Tex. 1997) (noting that BZW Barclays Global Investors, N.A. and Mellon Bank Corporation submitted a letter to the court in support of Wisconsin as lead plaintiff).

> n273 The State of Wisconsin Investment Board has successfully petitioned the court to be appointed "monitor" of the S3 and Adaptek securities class actions. As monitor, SWIB is added to the service list and may be heard on any issue. *But see* Helwig v. Vencor, Inc., No. 3:97CV-835-5 (W.D. Ky. Sept. 29, 1998) (memorandum opinion and order) (denying SWIB's motion to enter an appearance and act as a monitor of the litigation) (on file with *The Business Lawyer*, University of Maryland School of Law).

The Uniform Standards Act could have the unintended effect of further reducing the number of institutions moving to be named lead plaintiff. If institutional investors seek lead plaintiff status post-Uniform Standards Act in a *class* action, the Act's preemption provisions would bar them from asserting pendent state claims in federal court. Institutions bringing *individual* actions in federal court, however, would remain free to assert state claims pendent to their federal claims. This incentive to bring individual actions could reduce further the small number of institutional investors seeking lead plaintiff status.

## CONCLUSION

While developments in California may have led to the passage of the Uniform Standards Act, that Act is, of course, not limited to preempting California class actions. Rather, it preempts securities class actions in all fifty states in favor of a unitary national standard. A national standard for securities fraud litigation has a compelling logic for the orderly mind. As Chairman Levitt said during the hearings on NSMIA, "The current system of dual federal-state regulation is not the system that Congress or the Commission would create today . . . . An appropriate balance can be attained in the federal-state arena that better allocates responsibilities, reduces compliance costs and facilitates capital formation, while continuing to provide for the protection of investors." n274

© ABA, The Business Lawyer, November, 1998

n274 *Testimony of Arthur Levitt, Chairman, Securities and Exchange Commission, Before the Senate Comm. on Banking, Housing and Urban Affairs Concerning S. 1815, The "Securities Investment Promotion Act of 1996"* (June 5, 1996).

Notwithstanding the logic of a national standard, the role of federalism in our constitutional order recognizes our commitment to diversity of legal regimes. There is a strong presumption in our legal culture that the states should be left free to regulate even where Congress has acted. In adopting the securities laws during the 1930s, Congress explicitly preserved the role of state law in protecting the securities markets from fraud and abuse. n275 The perceived migration of securities class actions to state courts, however, threatened to undermine the policy goals established by Congress in enacting the Reform Act. The Uniform Standards Act seeks to eliminate the use of state courts to circumvent the Reform Act. Subsequent study will be needed to determine whether the Uniform Standards Act serves the goals of the Reform Act and to determine the consequences of establishing a uniform national standard for securities class actions.

n275 Both the Securities Act and Exchange Act contain savings clauses. Securities Act § 16, 15 U.S.C. § 77p; Exchange Act § 28, 15 U.S.C. § 78bb.

By greatly reducing the threat of state securities litigation under a multiplicity of standards, the Uniform Standards Act promises corporations a national standard with greater predictability and reduced liability exposure. The Uniform Standards Act should allow companies to determine more precisely their disclosure obligations and potential liabilities because they can look primarily to federal law. Accordingly, the Uniform Standards Act should reduce compliance and liability costs for a substantial portion of the corporate community. n276 These are important benefits that only a national standard can produce.

n276 A substantial number of companies have nationally traded securities and thus have diminished liability in state court. At the end of 1996, 2907 companies had securities trading on the NYSE. NYSE FACT BOOK (1996). At the end of 1996, 751 companies had securities trading on the AMEX. 1997 AMEX FACT BOOK. In addition, at the end of 1996, 4371 securities traded on NASDAQ. NASDAQ FACT BOOK (1997). As a point of reference, over 9000 issuers report to the SEC.

There are reasons to doubt, however, the extent to which the Uniform Standards Act will succeed in producing a truly national standard. State securities regulators continue to exercise their traditional enforcement authority over the accuracy of corporate statements. More importantly, institutions and wealthy individuals remain free to sue in state courts. Institutional investors now hold the majority of securities in this country, and account for the overwhelming majority of securities trading. n277 If these large investors opt for state actions on a substantial scale, the goal of a national standard for securities fraud actions will be frustrated. This advantage held by large investors, while probably small now, could become substantial during the anticipated litigation explosion associated with the "Year 2000" computer malfunctions: the federal safe harbor for forward-looking statements does not by its terms apply to state actions.

n277 *See* Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 YALE L. J. 2053, 2055-56, nn.9 & 10 (June 1995) (noting that institutions own an estimated 53% of public and private equity and that institutions accounted for an estimated 66% of daily share volume on the NYSE in 1992).

Encouraging institutional investors to opt for state court actions over federal class actions imposes costs apart from its impairment of the goal of national uniformity. It also could affect small investors. By discouraging institutional investors from participating in federal class actions that include the small investor, the Uniform Standards Act leaves small investors more vulnerable to potential overreaching by plaintiffs' lawyers. Protecting small investors was purportedly an important objective of the Reform Act, and it certainly was the central premise of the lead plaintiff provision. The interests of institutional investors would be harnessed with those of small investors, and the institutions would take charge of class actions on small investors' behalf. The failure of the lead plaintiff provision suggests that this scenario has not played out as Congress intended. Institutional investors, not surprisingly, have looked out for their own interests--they have no duty, legal or moral, to protect unaffiliated small investors. The preferences (intended or not) given to institutional investors in the Uniform Standards Act exacerbates the divergence of interests between small investors and institutions. Small investors cannot rely on institutional investors for their protection.

© ABA, The Business Lawyer, November, 1998

Investor protection loses from the Uniform Standards Act in other ways. Although the *Matsushita* "reverse auction" problem may have been mitigated, substantial state protections have been sacrificed. State statutes provide relief for investors not available under the national standard post-Reform Act, such as aiding and abetting liability and longer statutes of limitations. n278 Congress rebuffed attempts to make these elements of the national standard as part of the Uniform Standards Act. n279 And if reck-lessness is overturned as the federal standard for scienter, despite support from the Uniform Standards Act's legislative history, investors may face insurmountable obstacles to recovery. Institu-tional investors, of course, will not face these limitations, as they can continue to proceed under state law.

n278 *See supra* note 14 and accompanying text

n279 On May 13, 1998, on the floor of the Senate, Senator Sarbanes offered amendments that would have preserved the state statute of limitations and aiding and abetting liability at the federal level in actions that were removed to federal court. These amendments were defeated. 144 CONG. REC. S4804 (daily ed. May 13, 1998).

The rise of institutional investors was supposed to provide important benefits for investor protection--pension and mutual funds make up a wealthy, well-organized interest group, likely to have substantial clout in the legislature, whether it be state or federal. The institutions, the theory goes, in pursuing their own self-interest, would also look out for the interests of small investors. But when push came to shove in the interest-group lobbying over the Uniform Stan-dards Act, institutions were largely silent. Their silence is hardly a surprise, as the limitations on state class actions do not affect the institutions' ability to protect their investments. Their continued ability to rely on state law in individual actions is a fortuitous by-product of the Uniform Standards Act's focus on class actions.

Congress ignored pleas during the Uniform Standards Act debates favoring stronger investor protection, as its focus remained squarely on facilitating capital formation. Although the SEC did obtain several important modifications to the bill, it was unable to secure the longer statute of limitations and aiding and abetting liability that it has long advocated for the national standards. n280 State regulators opposed the Uniform Standards Act, but as with NSMIA, they had little impact on the final product, although their own enforcement turf was protected, as with NSMIA. n281

n280 *See May 19 Levitt Testimony, supra* note 103, at 15 ("The Commission continues to favor legislation restoring a private right of action for aiding and abetting and lengthening the federal securities law statute of limitations.") (statement of Arthur Levitt).

n281 *See, e.g.*, House Testimony of Blake Campbell, Ass't Comm'r, Securities Regulation & A. Peter Kezir-ian, Jr., Gen. Counsel, Cal. Dept. of Corp., at 6 (May 19, 1998) (endorsing Uniform Standards Act, while oppos-ing "any attempt to infringe on California's authority to pursue violators of its own laws and any federal legisla-tive language which might be construed to prevent the bringing of public enforcement actions in either state or federal courts"). NSMIA specifically preserved state enforcement authority over misstatements in public offer-ings. *See* 15 U.S.C. § 77r(c).

The enactment of the Uniform Standards Act provides a different perspective on the long debate over state versus federal law governing the rights and responsibilities of corporations. Advocates of investor protection have long argued that states competing for corporate charters are caught in a "race to the bottom," pandering to well-organized corporate managers at the expense of investors. n282 The solution to this problem, they say, is to eliminate that competition among the states through federal corporate chartering--only at the federal level can investors be adequately protected. n283 But in passing the Uniform Standards Act, Congress expressed no more concern for small investors than state leg-islatures have in setting the parameters for corporate charters. Post-Reform Act, state blue sky laws afforded investors greater protections on a number of fronts than did the federal standard. The Uniform Standards Act sets the sun on those blue sky laws, showing that federal law can hardly be considered a panacea for investor protection.

n282 *See, e.g.*, William L. Cary, *Federalism and Corporate Law: Reflections Upon Delaware*, 83 YALE L. J. 663 (1974).

n283 For a public choice critique of this argument, see Mary E. Kostel, Note: *A Public Choice Perspective on the Debate Over Federal Versus State Corporate Law*, 79 VA. L. REV. 2129 (1993) (arguing that "federally

© ABA, The Business Lawyer, November, 1998

created legislation may actually be *less* shareholder protective than legislation that arises out of competition be-tween the states").